UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARIA ROSE FIORENZA,

Plaintiff(s),

-against-

Case No.: 08-CV-0858
(DF) (SAS)

FREMONT INVESTMENT & LOAN, HSBC BANK
U.S.A., NATIONAL ASSOCIATION, AS TRUSTEE
FOR NOMURA HOME EQUITY LOAN, INC.
ASSET-BACKED PASS THROUGH CERTIFICATES
SERIES 2006-FM2, and GRACE M. PELLEGRINO,
d/b/a GMP FINANCIAL SERVICES,

Defendant(s).

MEMORANDUM OF LAW IN SUPPORT OF DEFEDANTS FREMONT
INVESTMENT & LOAN and HSBC BANK U.S.A. NATIONAL ASSOCIATION, AS
TRUSTEE FOR NOMURA HOME EQUITY LOAN, INC., ASSET-BACKED
PASS THROUGH CERTIFICATES SERIES 2006-FM2'S MOTION TO
DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(b)(6)

**KNUCKLES & KOMOSINSKI, P.C.**
KENNETH J. FLICKINGER, ESQ. (KJ-1179)
Attorneys for Defendants
FREMONT INVESTMENT & LOAN and
HSBC BANK U.S.A. NATIONAL
ASSOCIATION, AS TRUSTEE FOR
NOMURA HOME EQUITY LOAN, INC.,
ASSET-BACKED PASS THROUGH
CERTIFICATES SERIES 2006-FM2
220 White Plains Road, 6th Floor
Tarrytown, NY 10951
Telephone: (914) 220-0155
Facsimile: (914) 366-0080

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................ii-iii

PRELIMINARY STATEMENT..........................................................................1

STATEMENT OF FACTS...................................................................................3

STANDARD OF REVIEW...................................................................................5

ARGUMENT.........................................................................................................6

    I.      PLAINTIFF'S CLAIMS FOR DAMAGES FOR ALLEGED VIOLATION OF THE TRUTH IN LENDING ACT ARE BARRED BY THE STATUTE OF LIMITATIONS..........................................................................................6

    II.    PLAINTIFF'S CLAIM FOR AN EXTENDED RIGHT TO RESCIND THE LOAN PURSUANT TO 15 U.S.C. § 1635 IS BARRED BY THE DOCTRINE OF ISSUE PRECLUSION.......................................................................................7

    III.   DISMISSAL OF PLAINTIFF'S FEDERAL STATUTORY CLAIMS SHOULD RESULT IN DECLINATION OF SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S ALLEGED STATE LAW CLAIMS...........................................10

    IV.   PLAINTIFF'S ENTIRE ACTION SHOULD BE DISMISSED AS AGAINST DEFENDANT HSBC PURSUANT TO THE DOCTRINE OF CLAIM PRECLUSION...........................................................................................11

CONCLUSION....................................................................................................13

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)....................5

Allen v. McCurry, 449 U.S. 90 (1980)...........................................................................8

American Mortgage Network, Inc. v. Shelton, 486 F.3d 815 (4th Cir. 2007)............10

Atl. Mut. Ins. Co. v. Balfour Maclame Int'l Ltd., 968 F.2d 196 (2d Cir. 1992)..........5

Bell Atl. Corp. v. Twombly, 127 S.Ct. 1995, 167 L.Ed.2d 929 (2007).........................5

Cardiello v. Money Store, Inc., 2001 U.S. Dist. LEXIS 7107

(S.D.N.Y. June 1, 2001)...................................................................................................7

Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 108 S.Ct. 614,

98 L.Ed.2d 720 (1988)...................................................................................................10

Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995).............................................................9

Conley v. Gibson, 355 U.S. 41 (1957)............................................................................5

Conopco, Inc. v. Roll Intern., 231 F.3d 82, 87 (2d Cir. 2000)....................................8

Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394 (1981)....................................12

HSBC Bank U.S.A. v. Fiorenza, No. 13039/2007 (NYS Sup. Ct. Kings Cty).........7

Iqbal v. Hasty, No. 05-5768, 2007 U.S. App. LEXIS 13911

(2d Cir. June 14, 2007)....................................................................................................6

Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326 (2d Cir. 1997)...........................5

Johnson v. Metrofund, Ltd., 1988 WL 7792, S.D.N.Y. (January 27, 1988)...............9

Maharaj v. Bankamerica Corp., 128 F.3d 94 (2d Cir. 1997)....................................12

Makarova v. U.S., 201 F.3d 110 (2d Cir. 2000).............................................................5

Marcus v. AT&T Corp., 138 F.3d 46 (2d Cir. 1998)..................................................11

O'Brien v. City of Syracuse, 54 N.Y.2d 353 (1981)....................................................12

Robinson v. Gov't of Malaysia, 269 F.3d 133 (2d Cir. 2001).......................................5

United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130,

16 L.Ed.2d 218 (1966)...............................................................................................11

Yoon v. Fordham Univ. Faculty and Admin. Ret. Plan.,

263 F.3d 196 (2d Cir. 2001).......................................................................................12

## STATUTES

15 U.S.C. § 1635.............................................................................................1,7-9

15 U.S.C. § 1639.................................................................................................1

15 U.S.C. § 1640............................................................................................1,6-7

28 U.S.C. § 1367.............................................................................................2,10

18 U.S.C. § 1951..............................................................................................10

Fed. R. Civ. P. 12(b)(1)...................................................................................1,5,14

Fed. R. Civ. P. 12(b)(6)....................................................................................1,14

## **PRELIMINARY STATEMENT**

Defendants, FREMONT INVESTMENT & LOAN and HSBC BANK U.S.A. NATIONAL ASSOCIATION, AS TRUSTEE FOR NOMURA HOME EQUITY LOAN, INC., ASSET-BACKED PASS THROUGH CERTIFICATES SERIES 2006-FM2 (hereinafter "Moving Defendants"), hereby move this Court for an Order pursuant to Fed. R. Civ. P. 12(b)(1) and (6) dismissing Plaintiff's Complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

Plaintiff's Complaint fails to state a claim upon which relief can be granted against Moving Defendants, as Plaintiff has failed to bring her claims pursuant to 15 U.S.C. §1601, et seq., specifically 15 U.S.C. §§ 1639 and 1640 within one year as required pursuant to 15 U.S.C. § 1640(e).

Plaintiff's claims pursuant to 15 U.S.C. § 1635 seeking rescission of the subject mortgage and an extended three-year right of rescission for alleged failure to provide Plaintiff with a notice of right to cancel are barred by the doctrines of claim preclusion and issue preclusion, as the identical claims have already been raised, litigated, and adjudicated in the Supreme Court of the State of New York for the County of Kings. Specifically, the New York Court held that "Fiorenza does not dispute that on May 11, 2006, at the closing, she was given a form entitled "Notice of Right to Cancel" which states, in accordance with 15 U.S.C. 1635(a), that she had until May 15, 2006 to cancel the transaction." This finding of the New York State Court was actually and necessarily decided, was essential to its judgment, and Plaintiff had a full and fair opportunity to litigate the issue, which requires that the decision be given preclusive effect in the instant action.

Plaintiff alleges Federal jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 which allows a United States Court to exercise supplemental jurisdiction over state law claims when the United States Court has original jurisdiction over the action, as here where the court has original Federal Question jurisdiction over the Federal statutory claims pursuant to 15 U.S.C. 1601, et seq.  However, as Plaintiff's claims pursuant to 15 U.S.C. 1601, et seq. must be dismissed as set forth herein, this Honorable Court may decline to exercise jurisdiction over the allegedly supplemental state law claims pursuant to 28 U.S.C. § 1367(c)(3).

## **STATEMENT OF FACTS**

Plaintiff Maria Rose Fiorenza ("Plaintiff"), through defendant Grace M. Pellegrino, d/b/a GMP Financial Services ("Pellegrino"), a licensed mortgage broker, applied to defendant Fremont Investment & Loan ("Fremont") for a loan primarily to refinance indebtedness to Ocwen Federal Bank in the amount of $278,697.17, and to Stillwater Private Construction Loan in the amount of $310,152.55. A copy of the residential mortgage application is annexed to the moving papers as **Exhibit "B"**.

Fremont processed the application submitted by Pellegrino on Plaintiff's behalf, and agreed to provide Plaintiff with a loan in the amount of $634,500.00 (the "Loan"), to be secured by a first mortgage on the premises located at 86 Crescent Place, Yonkers, New York 10704 (the "Premises").

As is custom in the warehouse lending industry, Pellegrino selected the settlement agent to represent Fremont at the closing of the loan transaction. In the instant matter, Pellegrino selected Steven W. Stutman, Esq.

Thereafter, on or about May 11, 2006, the Loan closed in the offices of Steven W. Stutman, located at 500 Old Country Road, Garden City, New York. During the closing, Plaintiff executed her evidence of obligation, evidencing indebtedness to Fremont in the amount of $634,500.00 (the "Note"). A Copy of the fully executed Note is annexed to the moving papers as **Exhibit "C"**.

On or about the same date, Plaintiff executed a mortgage in the amount of $634,500.00 (the "Mortgage") conveying a security interest in the Premises to Fremont, a copy of which is annexed to the moving papers as **Exhibit "D"**.

The Note and Mortgage were thereafter sold to defendant HSBC Bank U.S.A., National Association, as Trustee for Nomura Home Equity Loan, Inc., Asset-Backed Pass Through Certificates Series 2006-FM2 (hereinafter "HSBC").

Plaintiff defaulted on the regular monthly payment due on the Loan for November 1, 2006, and monthly thereafter, leaving an unpaid principal balance of $633,097.96.

HSBC commenced an action to foreclose the Mortgage on or about March 19, 2007. On or about April 12, 2007, Plaintiff interposed an Answer to the complaint for foreclosure of the Mortgage, a copy of which is annexed to the moving papers as **Exhibit "E**."

HSBC thereafter moved for summary judgment against Plaintiff's Answer. Plaintiff opposed the motion for summary judgment, alleging that her default on the Loan was due to a dispute with a building contractor that Plaintiff retained to repair the Premises, and that Plaintiff's inability to make the Mortgage payments resulted from her inability to place renters in the Premises. At no time did Plaintiff make any allegation that her default on the Mortgage was due to alleged misunderstanding or misrepresentation of the terms of the subject loan. A copy of Plaintiff's opposition to HSBC's motion for summary judgment is annexed to the moving papers as **Exhibit "F**."

HSBC's motion for summary judgment in the foreclosure action was granted. A copy of the decision granting HSBC's motion for summary judgment is annexed hereto as **Exhibit "G**."

A judgment of foreclosure and sale was granted to HSBC on or about December 26, 2007. Plaintiff thereafter brought an Order to Show Cause to stay the public sale of

-- 4 --

the Premises scheduled for March 3, 2008, to vacate the judgment of foreclosure and sale and for leave to amend the Answer which was opposed and fully briefed, and ultimately denied in a decision by Justice Lucindo Suarez dated March 24, 2008, a copy of which is annexed to the moving papers as **Exhibit "H**."

Plaintiff commenced the instant action seeking, *inter alia*, to rescind the Loan, terminate HSBC's security interest in the Premises, and seeking statutory damages, attorney's fees, and alleged punitive damages.

## STANDARD OF REVIEW

In considering a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b) (1), courts must accept as true the factual allegations contained in a complaint. See Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997) (citing Albright v. Oliver, 510 U.S. 266, 268, 114 S.Ct. 807, 810, 127 L.Ed.2d 114 (1994); Atl. Mut. Ins. Co. v. Balfour Maclame Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992). A court may also consider evidence beyond the pleadings to resolve jurisdictional questions. See Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 n.6 (2d Cir. 2001) (citing Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000)).

In Bell Atl. Corp. v. Twombly, 127 S.Ct. 1995, 167 L.Ed. 2d 929 (2007), the Supreme Court recently abandoned the long-standing precedent that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), (overruled by Bell Atl. Corp., 127 S.Ct. 1955 (2007). Holding that "Conley's 'no set of facts'

language has been questioned, criticized, and explained away long enough," the Supreme Court expressly rejected the standard in favor of a requirement that the plaintiff plead enough facts "to state a claim for relief that is plausible on its face." <u>Bell Atl. Corp.</u>, 127 S.Ct. at 1969, 1974. The Court explained that the complaint "must be enough to raise a right to relief above the speculative level." <u>Id.</u> at 1965.

The Second Circuit has interpreted <u>Bell Atlantic</u> to require "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." <u>Iqbal v. Hasty</u>, No. 05-5768, 2007 U.S. App. LEXIS 13911, at *35 (2d Cir. June 14, 2007).

## <u>POINT I</u>

## <u>PLAINTIFF'S CLAIMS FOR DAMAGES FOR ALLEGED VIOLATION OF THE TRUTH IN LENDING ACT ARE BARRED BY THE STATUTE OF LIMITATIONS</u>

1.    Plaintiff's Complaint seeks rescission of the Mortgage and damages for alleged violations of TILA, codified at 15 U.S.C. § 1601, et seq.

2.    However, as admitted by Plaintiff at paragraph 31 of the Complaint, and as evidenced by the documents included as Exhibits hereto, the closing of the subject loan transaction occurred on May 11, 2006, and funded on or about May 16, 2006.

3.    15 U.S.C. § 1640(e) states in pertinent part "[a]ny action under this section may be brought in any United States district court, or in any other court of competent

jurisdiction, *within one year from the date of the occurrence of the violation*." (emphasis added).

4.   The language of 15 U.S.C. § 1640(e) is unambiguous in setting a one-year statute of limitations for any action brought thereunder.  It is well settled that the "occurrence of the violation" means the date the Plaintiff enters the loan agreement or, in the alternative, when the defendant performs by transmitting the loan funds to the Plaintiffs.  <u>Cardiello v. Money Store, Inc.</u>, 2001 U.S. Dist. LEXIS 7107 (S.D.N.Y. June 1, 2001).  Because the loan in question funded on May 16, 2006, any alleged violation in connection therewith occurred more than one year before the Complaint was filed.

5.   As such, and as Plaintiff has failed to bring an action within one year of the alleged violation, Plaintiff's Complaint for damages pursuant to 15 U.S.C. § 1601, et seq., must be dismissed as it is barred by the applicable statute of limitations.

## POINT II

## PLAINTIFF'S CLAIM FOR AN EXTENDED RIGHT TO RESCIND THE LOAN PURSUANT TO 15 U.S.C. § 1635 IS BARRED BY THE DOCTRINE OF ISSUE PRECLUSION

6.   Plaintiff claims she is entitled to an extended right of rescission of the Loan due to alleged failure to provide Plaintiff with a Notice of Right to Cancel in accordance with 15 U.S.C. § 1635.

7.   However, Plaintiff previously raised this claim in the Supreme Court of the State of New York for the County of Kings in an action entitled <u>HSBC Bank U.S.A.,</u>

-- 7 --

National Association, as Trustee for Nomura Home Equity Loan, Inc., Asset-Backed Certificates Series 2006-FM2 v. Maria Rose Fiorenza, et al., bearing index number 13039/2007 (the "Foreclosure Action").

8.      Under the doctrine of issue preclusion, or collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980).

9.      "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so…" Conopco, Inc. v. Roll Intern., 231 F.3d 82, 87 (2d Cir. 2000).

10.      In a decision dated March 24, 2006, Justice Lucindo Suarez rejected Plaintiff's claim that she did not receive a Notice of Right to Cancel in accordance with 15 U.S.C. 1635, stating "Fiorenza does not dispute that on May 11, 2006, at the closing, she was given a form entitled "Notice of Right to Cancel" which states, in accordance with 15 U.S.C. 1635(a), that she had until May 15, 2006 to cancel the transaction." See **Exhibit "H."**

11.      A review of Justice Suarez' decision reveals that Plaintiff asserted the identical claim regarding the identical transaction in the Foreclosure Action and was given an opportunity to litigate the issue of whether Plaintiff should be granted an extended three year right to rescind, which claim was explicitly rejected by the court therein. Particularly, Justice Suarez made findings that Fiorenza admitted receipt of the Notice of Right to Cancel, that the notice that was provided was in accordance with 15

U.S.C. § 1635(a), and that Fiorenza therefore had only until May 15, 2006 to cancel the transaction. Thus, the issue of whether Plaintiff has an extended three year right of rescission pursuant to 15 U.S.C. § 1635 has been decided and is therefore barred by the doctrine of issue preclusion.

12.    Issue preclusion requires a showing that "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir. 1995).

13.    As stated above, Plaintiff has already raised the issue of whether she is entitled to an extended three year right of rescission in the Foreclosure Action, the determination of which was necessary to the court's decision, and the issue was decided against Plaintiff after a full opportunity to brief and argue the issue before the court therein. As such, Plaintiff's claim for an extended three year right of rescission pursuant to 15 U.S.C. § 1635 must be dismissed pursuant to the doctrine of issue preclusion.

14.    Furthermore, Plaintiff's mere allegation that she was not provided with the Notice of Right to Cancel is insufficient to rebut the presumption of delivery that arises from production of a signed copy of the Notice of Right to Cancel, a copy of which is annexed to the moving papers as **Exhibit "A**." See Johnson v. Metrofund, Ltd. 1988 WL 7792, S.D.N.Y. (January 27, 1988) (plaintiff's mere allegation that she was not informed of her right to cancel until she retained counsel was insufficient to meet the burden of coming forward with evidence of non-delivery).

15.     As Plaintiff's claims for damages pursuant to 15 U.S.C. 1601, et seq., is barred by the statute of limitations, Plaintiff's only remaining claim pursuant to the Truth in Lending Act is for alleged rescission pursuant to an allegedly extended three year right of rescission.  Notwithstanding the grounds for dismissal of Plaintiff's claims for an extended three year right of rescission set forth above, said claims should also be dismissed based upon Plaintiff's failure to properly plead a cause of action for rescission of the Mortgage, as courts have held that the rescinding party's inability to tender the loan proceeds renders the remedy of rescission inappropriate. See American Mortgage Network, Inc. v. Shelton, 486 F.3d 815 (4th Cir. 2007).

## POINT III

## DISMISSAL OF PLAINTIFF'S FEDERAL STATUTORY CLAIMS SHOULD RESULT IN DECLINATION OF SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S ALLEGED STATE LAW CLAIMS

16.     Plaintiff has asked this Honorable Court to exercise supplemental jurisdiction over Plaintiff's alleged state law claims pursuant to 28 U.S.C. 1367. However, to the extent Plaintiff's Federal Question claims pursuant to 15 U.S.C. 1601, et seq., are dismissed, the District Court should decline to exercise supplemental jurisdiction over Plaintiff's pendent state law claims.

17.     The United States Supreme Court has instructed that courts should ordinarily decline to exercise supplemental jurisdiction in the absence of federal claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720

(1988) (noting that in the usual case where all federal claims are eliminated before trial, the relevant factors informing the decision of whether to exercise supplemental jurisdiction will "point towards declining to exercise jurisdiction over the remaining state-law claims"); <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well.").

18.     The Second Circuit shares this view: where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Valencia ex rel. Franco v. Lee</u>, 316 F.3d 299, 305 (2d Cir. 2003); <u>see</u> <u>also</u> <u>Marcus v. AT & T Corp.</u>, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well.");

19.     Based upon the foregoing, in the event Plaintiff's claims pursuant to 15 U.S.C. § 1601, et seq., are dismissed, the Court should decline to exercise supplemental jurisdiction over Plaintiff's alleged state law claims and dismiss the instant action in its entirety.

## POINT IV

## PLAINTIFF'S ENTIRE ACTION SHOULD BE DISMISSED AS AGAINST DEFENDANT HSBC PURSUANT TO THE DOCTRINE OF CLAIM PRECLUSION

20.     While the doctrine of issue preclusion should serve to bar Plaintiff's claim for an extended three year right of rescission of the Loan against all parties, the doctrine

of claim preclusion should serve to bar Plaintiff's entire action as against defendant HSBC, as Plaintiff raised or could have raised these claims against HSBC in the Foreclosure Action, but failed to do so.

21.    "Under both New York law and federal law, the doctrine of res judicata, or claim preclusion, provides that '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"  Maharaj v. Bankamerica Corp., 128 F.3d 94, 97 (2d Cir. 1997) (quoting Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981).

22.    "New York employs a 'transactional approach' to res judicata; thus 'once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.'"  Yoon v. Fordham Univ. Faculty and Admin. Ret. Plan., 263 F.3d 196, 200 (2d Cir. 2001) (citing O'Brien v. City of Syracuse, 54 N.Y.2d 353, 357 (1981)).

23.    Plaintiff clearly had the opportunity to assert the claims made in the instant action against HSBC in the Foreclosure Action.  As the claims made in the instant action arise out of the Loan closing, they arise out of the "same transaction or series of transactions" and Plaintiff's failure to raise them in the Foreclosure Action serves to bar her from asserting the claims herein.  Based upon the foregoing, Plaintiff's entire action as alleged against defendant HSBC should be dismissed with prejudice.

## CONCLUSION

24.     Plaintiff's claims in the instant action are a last ditch attempt to salvage the Premises from the damages allegedly caused by the building contractor Plaintiff retained to rebuild the Premises as evidenced by Plaintiff's initial allegations in the Foreclosure Action that her inability to make the Mortgage payments was a result of the contractor's failure to complete rebuilding the Premises, which resulted in Plaintiff's inability to place a renter in the Premises, and not a result of any alleged disclosure violations.

25.     As discussed above, Plaintiff's claim for damages pursuant to 15 U.S.C. 1601, et seq., are time-barred.  While Plaintiff's claim for an extended three year right of rescission has already been litigated and decided against Plaintiff and is barred by the doctrine of res judicata, Plaintiff also maintains no 'plausible' claim for rescission of the Loan as Plaintiff has never alleged an ability to repay the principal in order to effect rescission as required, and therefore fails to state a claim upon which relief can be granted.

26.     Based upon the foregoing, and the arguments and exhibits submitted herewith, it is respectfully requested that Plaintiff's Complaint be dismissed in its entirety.

WHEREFORE, FREMONT INVESTMENT & LOAN and HSBC BANK U.S.A. NATIONAL ASSOCIATION, AS TRUSTEE FOR NOMURA HOME EQUITY LOAN, INC., ASSET-BACKED PASS THROUGH CERTIFICATES SERIES 2006-FM2 respectfully request that the Court issue an Order pursuant to Federal Rule of Civil

-- 13 --

Procedure 12(b)(1) and 12(b)(6), dismissing the Complaint of the Plaintiffs for lack of subject matter jurisdiction and failure to state a claim, with prejudice, and for such other and further relief as the Court deems just and proper.

Dated:    Tarrytown, New York
          April 24, 2008

KNUCKLES & KOMOSINSKI, P.C.

By:
KENNETH J. FLICKINGER, ESQ. (KJ-1179)
Attorneys for Defendants
FREMONT INVESTMENT & LOAN and
HSBC   BANK   U.S.A.   NATIONAL
ASSOCIATION,   AS   TRUSTEE   FOR
NOMURA HOME EQUITY LOAN, INC.,
ASSET-BACKED   PASS   THROUGH
CERTIFICATES SERIES 2006-FM2
220 White Plains Road, 6th Floor
Tarrytown, NY 10951
Telephone: (914) 220-0155
Facsimile: (914) 366-0080

# EXHIBIT  A

XAN-05/30/2006

# NOTICE OF RIGHT TO CANCEL

Borrowers:  **MARIA ROSE FIORENZA**

Application #:  <u>5000205871</u>

---

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien, or security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occur last:

    (1) the date of the new transaction, which is <u>5/11/06</u>    ; or
    (2) the date you received your new Truth in Lending disclosures; or
    (3) the date you received this notice of your right to cancel.

If you cancel this transaction, the mortgage, lien, or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on your home has been cancelled, and we must also return to you any money or property you have given to us or anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below.

If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel the new transaction, you may do so by notifying us in writing, at:

    **FREMONT INVESTMENT & LOAN**

    **1411 OPUS PLACE - SUITE 600**
    **DOWNERS GROVE, IL 60515**
    **Funding Dept.    Attn: Funding Manager**

You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of <u>5/15/06</u>
                                                  (date)

(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____    _____
Consumer's Signature                 Date

---

I/We Received Two (2) copies of the **Notice of Right to Cancel** this Date ___*May 11*___ , 20_06_ .

*Maria Rose Fiorenza*
(Signature)  **MARIA ROSE FIORENZA**

_____
(Signature)

_____
(Signature)

_____
(Signature)

_____
(Signature)

_____
(Signature)

NORTCGEN  |xn   07/23/03

**FREMONT** INVESTMENT&LOAN

# EXHIBIT B

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse will not be used as a basis for loan qualification, but his or her liabilities must be considered because the Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☑ Conventional  ☐ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|
| | ☐ FHA  ☐ USDA/Rural Housing Service | | |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☑ Fixed Rate | ☐ Other (explain): |
|---|---|---|---|---|---|
| $  634,500 | 8.851 % | 360/360 | | ☐ GPM | ☐ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, ZIP)  13-36 Gillespie Avenue,  Bronx, NY 10461   County: Bronx | No. of Units 2 |
|---|---|
| Legal Description of Subject Property (attach description if necessary)  section 1002, block 5399, lot 18 | Year Built 2006 |

| Purpose of Loan | ☐ Purchase  ☐ Construction  ☐ Other (explain): | Property will be: |
|---|---|---|
| | ☑ Refinance  ☐ Construction-Permanent | ☑ Primary Residence  ☐ Secondary Residence  ☐ Investment |

Complete this line if construction or construction-permanent loan.

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a+b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

Complete this line if this is a refinance loan.

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements  ☐ made  ☐ to be made |
|---|---|---|---|---|
| | $ | $ | | Cost: $ |

| Title will be held in what Name(s)  Maria Florenza | Manner in which Title will be held  Single woman | Estate will be held in:  ☑ Fee Simple  ☐ Leasehold (show expiration date) |
|---|---|---|

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain)  Checking/Savings | |
|---|---|

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable)  Maria Florenza | Co-Borrower's Name (include Jr. or Sr. if applicable) | |

| Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School  14 | Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School |
|---|---|---|---|---|---|---|---|

| ☐ Married  ☑ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Co-Borrower)  no. 1   ages 16 | ☐ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Borrower)  no.   ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP)  ☐ Own  ☑ Rent  8mo  No. Yrs.  86 Cresent place  Yonkers, NY 10704 | Present Address (street, city, state, ZIP)  ☐ Own  ☐ Rent   No. Yrs. |
|---|---|

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

If residing at present address for less than two years, complete the following:

| Former Address (street, city, state, ZIP)  ☑ Own  ☐ Rent  8  No. Yrs.  13-36 Gillespie Avenue  Bronx, NY 10461 | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent   No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| Name & Address of Employer  Game Day Grill Sports Bar and Restaurant  3168 E. Tremont Avenue  Bronx, NY 10461 | ☐ Self Employed | Yrs. on this job  6 yr(s)  Yrs. employed in this line of work/profession  30 | Name & Address of Employer | ☐ Self Employed | Yrs. on this job  Yrs. employed in this line of work/profession |
| Position/Title/Type of Business  chef/caterer | | Business Phone (incl. area code)  718-409-6556 | Position/Title/Type of Business | | Business Phone (incl. area code) |

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

| Name & Address of Employer  UNA Cafe  Bronx Childrens Hospital  Bronx, NY | ☐ Self Employed | Dates (from-to)  1997 -  present | Name & Address of Employer | ☐ Self Employed | Dates (from-to) |
|---|---|---|---|---|---|
| | | Monthly Income  $ | | | Monthly Income  $ |
| Position/Title/Type of Business  head chef | | Business Phone (incl. area code)  718-862-3383 | Position/Title/Type of Business | | Business Phone (incl. area code) |

| Name & Address of Employer | ☐ Self Employed | Dates (from-to) | Name & Address of Employer | ☐ Self Employed | Dates (from-to) |
|---|---|---|---|---|---|
| | | Monthly Income  $ | | | Monthly Income  $ |
| Position/Title/Type of Business | | Business Phone (incl. area code) | Position/Title/Type of Business | | Business Phone (incl. area code) |

| Freddie Mac Form 65   01/04  Calyx Form 1003 Lomapp1.frm 01/04 | Page 1 of 4 | Borrower   _KRF_  Co-Borrower | Fannie Mae Form 1003   01/04 |
|---|---|---|---|

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 9,850.00 | $ | $ 9,850.00 | Rent | | |
| Overtime | | | | First Mortgage (P&I) | | 5,037.23 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 125.00 |
| Dividends/Interest | | | | Real Estate Taxes | | 400.00 |
| Net Rental Income | 1,875.00 | | 1,875.00 | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income" below) | 2,005.00 | | 2,005.00 | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 13,730.00 | $ | $ 13,730.00 | Total | $ | $ 5,562.23 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

Describe Other Income   Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| B | husbands social sec. | 2,005.00 |
| | net rental on subject 2500X75%=1875 | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a spouse, this statement and supporting schedules must be completed about that spouse also.

Completed  [X] Jointly  [ ] Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by: given to builder beg of project | $ 25,000 | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| List checking and savings accounts below | | Name and address of Company    Ocwen Federal bank | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union    Chase  Checking | | | | |
| | | Acct. no. 102102498 | * | 275,088 |
| Acct. no. | $ 2,533 | Name and address of Company    toyota | $ Payment/Months | |
| Name and address of Bank, S&L, or Credit Union    Chase  savings | | | | |
| | | Acct. no. 7040226207594001 | 299 | 12,679 |
| Acct. no. | $ 18,012 | Name and address of Company    chase | $ Payment/Months | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. 4357877019009430 | 19 | 950 |
| Acct. no. | $ | Name and address of Company    Gem/jcp | $ Payment/Months | |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. 9386770568 | 15 | 22 |
| Acct. no. | $ | Name and address of Company    Stillwell  Private construction loan | $ Payment/Months | |
| Stocks & Bonds (Company name/ number & description) | $ | | | |
| | | Acct. no. | * | 228,000 |
| Life insurance net cash value | $ | Name and address of Company | $ Payment/Months | |
| Face amount: $ | | | | |
| Subtotal Liquid Assets | $ 45,545 | Acct. no. | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ 705,000 | Name and address of Company | $ Payment/Months | |
| Vested interest in retirement fund | $ | | | |
| Net worth of business(es) owned (attach financial statement) | $ | | | |
| Automobiles owned (make and year)    2005 toyota | $ 14,000 | Acct. no. | | |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | | | |
| | | Job Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 333 | |
| Total Assets a. | $ 764,545 | Net Worth (a minus b) $ 247,800 | Total Liabilities b. | $ 516,745 |

| | | |
|---|---|---|
| Freddie Mac Form 65   01/04 | Page 2 of 4 | Fannie Mae 1003   01/04 |
| Calyx Form 1003   Loanapp2.frm 01/04 | Borrower _HRF_ | |
| | Co-Borrower | |

## VI. SCHEDULE OF REAL ESTATE OWNED

Schedule of Real Estate Owned (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 13-36 Gillespie Avenue Bronx, NY 10461 | 2-4PLX | $ 705,000 | 692,000 | $ 2,500 | $ | $ | $ |
| | | | | | | | |
| Totals | $ 705,000 | 692,000 | $ 2,500 | $ | | $ | |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION    VIII. DECLARATIONS

| | | If you answer "yes" to any questions a through i, please use continuation sheet for explanation. | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|---|
| | | | Yes | No | Yes | No |
| a. Purchase price | $ | | | | | |
| b. Alterations, improvements, repairs | | a. Are there any outstanding judgments against you? | ☐ | ☑ | ☐ | ☐ |
| c. Land (if acquired separately) | | b. Have you been declared bankrupt within the past 7 years? | ☐ | ☑ | ☐ | ☐ |
| d. Refinance (incl. debts to be paid off) | 740,000.00 | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☑ | ☐ | ☐ |
| e. Estimated prepaid items | | | | | | |
| f. Estimated closing costs | | d. Are you a party to a lawsuit? | ☐ | ☑ | ☐ | ☐ |
| g. PMI, MIP, Funding Fee | | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | ☐ | ☑ | ☐ | ☐ |
| h. Discount (if Borrower will pay) | | | | | | |
| i. Total costs (add items a through h) | 740,000.00 | | | | | |
| j. Subordinate financing | | | | | | |
| k. Borrower's closing costs paid by Seller | | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? | ☐ | ☑ | ☐ | ☐ |
| l. Other Credits (explain) | | | | | | |
| Cash Deposit | 25,000.00 | g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☑ | ☐ | ☐ |
| | | h. Is any part of the down payment borrowed? | ☐ | ☑ | ☐ | ☐ |
| | | i. Are you a co-maker or endorser on a note? | ☐ | ☑ | ☐ | ☐ |
| | | j. Are you a U.S. citizen? | ☑ | ☐ | ☐ | ☐ |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 634,500.00 | k. Are you a permanent resident alien? | ☐ | ☑ | ☐ | ☐ |
| n. PMI, MIP, Funding Fee financed | | l. Do you intend to occupy the property as your primary residence? If "Yes", complete question m below. | ☑ | ☐ | ☐ | ☐ |
| o. Loan amount (add m & n) | 634,500.00 | m. Have you had an ownership interest in a property in the last three years? | ☑ | ☐ | ☐ | ☐ |
| | | (1) What type of property did you own—principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | 151,000.00 | (2) How did you hold title to the home—solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described herein; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated herein; (6) any owner or servicer of the Loan may verify or reverify any information contained in the application from any source named in this application, and Lender, its successors or assigns may retain the original and/or an electronic record of this application, even if the Loan is not approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the owner or servicer of the Loan may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X *Mariarose Indelicato* | ( )/ 08 | | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may discriminate neither on the basis of this information, nor on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation or surname. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | CO-BORROWER | ☐ I do not wish to furnish this information |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino   ☐ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino   ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American | Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American |
| | ☐ Native Hawaiian or Other Pacific Islander   ☑ White | | ☐ Native Hawaiian or Other Pacific Islander   ☐ White |
| Sex: | ☑ Female   ☐ Male | Sex: | ☐ Female   ☐ Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) Grace Pellegrino | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: ☐ Face-to-face interview ☐ Mail ☑ Telephone ☐ Internet | Interviewer's Signature *Grace Pellegrino*   Date | |
| | Interviewer's Phone Number (incl. area code) 516-833-7150 | |

Freddie Mac Form 65   01/04
Calyx Form 1003 Loanapp3.frm 01/04

Page 3 of 4

Fannie Mae Form 1003   01/04

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: Maria Florenza | Agency Case Number: |
| | Co-Borrower: | Lender Case Number: |

| ASSETS | Cash or Market Value | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | $ | Acct. No. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payt./Mos. | $ |
| Acct. no. | | Acct. No. | | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature: | Date | Co-Borrower's Signature: | Date |
|---|---|---|---|
| X *[signature]* | | X | |

Freddie Mac Form 65    01/04
CALYX Form 1003 Lnapp4sol.frm 01/04

Page 4 of 4

Fannie Mae 1003    01/04

# EXHIBIT  C

CERTIFIED COPY

# ADJUSTABLE RATE NOTE
### (6-Month LIBOR Index - Rate Caps)
### (Assumable during Life of Loan) (First Business Day of Preceding Month Lookback)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

May 11, 2006                 BREA, CA 92821
[Date]                              [City]                                         [State]

1336 GILLESPIE AVENUE   BRONX, NY 10461

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $        634,500.00            (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **FREMONT INVESTMENT & LOAN**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **9.000**            %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on **July 1, 2006**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 1, 2036**                    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **2727 E IMPERIAL HIGHWAY, BREA CA 92821**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $        5,105.34    . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**MULTISTATE ADJUSTABLE RATE NOTE - 6-Month LIBOR Index (Assumable during Life of Loan) (First Business Day Lookback) - Single Family - Freddie Mac UNIFORM INSTRUMENT**

VMP®-815N (0404)              Form 5520 3/04

VMP Mortgage Solutions (800)521-7291

Page 1 of 4                                  Initials: _____

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of **June 1, 2008** , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six and Seven Hundred Seventy-Nine Thousandths** percentage points ( **6.7790** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.000** % or less than **9.0000** %. Thereafter, my interest rate will never be increased or decreased on any subsequent Change Date by more than **1.5000** from the rate of interest I have been paying for the preceding period. My interest rate will never be greater than **15.0000** % or less than **9.0000** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.0**% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

 -B15N (0404)

Page 3 of 4

Form 5520 3/04

Initials: _____

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Maria Rose Fiorenza_ (Seal)
MARIA ROSE FIORENZA                -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

[Sign Original Only]

VMP-815N (0404)                Page 4 of 4                Form 5520 3/04

EXHIBIT  D

Return To:
FREMONT INVESTMENT & LOAN
P.O. BOX 34078
FULLERTON, CA  92834-34078

Prepared By:
BARBARA LICON

5000206871

——————————— [Space Above This Line For Recording Data] ———————————

# MORTGAGE MIN 1001944-5000206871-7

### WORDS USED OFTEN IN THIS DOCUMENT

(A) "Security Instrument." This document, which is dated  May 11, 2006
together with all Riders to this document, will be called the "Security Instrument."
(B) "Borrower."  MARIA ROSE FIORENZA, AN UNMARRIED WOMAN

whose address is  86 CRESCENT PLACE   , YONKERS, NY 10704
                            sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing under
the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel.
(888) 679-MERS. FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE
MORTGAGEE OF RECORD.
(D) "Lender."  FREMONT INVESTMENT & LOAN

will be called "Lender." Lender is a corporation or association which exists under the laws of
CALIFORNIA                              . Lender's address is
2727 E IMPERIAL HIGHWAY, BREA CA 92821

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3033 1/01

VMP -6A(NY) (0005).02
Page 1 of 17          Initials: M.R.F.
VMP Mortgage Solutions, Inc. (800)521-7291

(E) **"Note."** The note signed by Borrower and dated **May 11, 2006**                          , will be called the "Note." The Note shows that I owe Lender **Six Hundred Thirty-Four Thousand, Five Hundred and No/100 ----------------------------------** Dollars (U.S. $        **634,500.00**        ) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by **June 1, 2036**

(F) **"Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."

(G) **"Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(I) **"Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) **"Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(K) **"Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(L) **"Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

(N) **"Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(O) **"Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(Q) **"RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

**DESCRIPTION OF THE PROPERTY**

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

(A) The Property which is located at

**1336 GILLESPIE AVE**                                                                          [Street]
**BRONX**                               [City, Town or Village] , New York **10461**          [Zip Code].
This Property is in **BRONX**                                        County. It has the following legal description:

**SEE ATTACHED LEGAL DESCRIPTION**

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

Initials: _M R F_

VMP-6A(NY) (0005).02                    Page 3 of 17                              Form 3033 1/01

ALTA LOAN POLICY

# STEWART TITLE
## INSURANCE COMPANY

### SCHEDULE A
*(continued)*

Title No.: MSN9001                                         Policy No · M-8832-948801

### DESCRIPTION

Premises commonly known as:  1336 Gillespie Avenue
Bronx, NY 10460

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the County of Bronx, City and State of New York, being Lots Nos. 212 and 213 on a map entitled " Map of 214 choice lots known as the Koch Homestead", made by Douglas Knox, dated May 15, 1909, and filed in the Office of the Register of New York Count July 14, 1909, as Map No. 1354, and bounded and described as follows:

BEGINNING at the intersection of the easterly side of Gillespie Avenue with the southerly side of LaSalle Avenue;

RUNNING THENCE easterly along LaSalle Avenue 102.77 feet;

THENCE southerly parallel with Gillespie Avenue 63.27 feet (63.34 feet, Survey) to the southerly line of Lot No. 212;

THENCE westerly along the same and at right angles to Gillespie Avenue, 100 feet to the easterly side of Gillespie Avenue;

THENCE northerly along the same 39.58 feet (39.65 feet, Survey) to the point of BEGINNING.

FOR CONVEYANCE ONLY

BEING THE SAME PREMISES CONVEYED TO Maria Rose Fiorenza, who acquired title by a deed from Estate of Ann Masi, Eleanor Bonsanti, Executrix , dated June 21, 1996, recorded July 18, 1996 in Reel 1402 on Page 2408.

TOGETHER with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of and adjoining said premises.

4622 (7/93)

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

**(a) Borrower's Obligations.**

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) Lender's Obligations.

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) Adjustments to the Escrow Funds.

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

4. Borrower's Obligation to Pay Charges, Assessments And Claims. I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior

to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period

VMP®-6A(NY) (0005).02                    Page 7 of 17          Initials: HBF          Form 3033 1/01

that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

(a) **Maintenance and Protection of the Property.**

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b) **Lender's Inspection of Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes

Initials: _MRF_

VMP®-6A(NY) (0005).02                Page 9 of 17                Form 3033 1/01

coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

11. Agreements About Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the

Initials: MBF

-6A(NY) (0005).02          Page 10 of 17          Form 3033 1/01

Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

(a) Borrower's Obligations.

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

(b) Lender's Rights.

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing

any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.

If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which

will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law; and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another

-6A(NY) (0005).02                 Page 14 of 17          Initials: _HRF_          Form 3033 1/01

Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

23. **Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25. **Borrower's Statement Regarding the Property [check box as applicable].**

☒ This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐ This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☐ This Security Instrument does not cover real property improved as described above.

Initials: *MRF*

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____          _Maria Rose Fiorenza_____ (Seal)
                                          MARIA ROSE FIORENZA           -Borrower

_____          _____ (Seal)
                                                                         -Borrower

_____ (Seal)           _____ (Seal)
                        -Borrower                                        -Borrower

_____ (Seal)           _____ (Seal)
                        -Borrower                                        -Borrower

_____ (Seal)           _____ (Seal)
                        -Borrower                                        -Borrower

VMP-6A(NY) (0005).02              Page 16 of 17              Form 3033 1/01

STATE OF NEW YORK,    *NASSAU*    County ss:

On the 11Th day of *May, 2006* before me, the undersigned, a notary public in and for said state, personally appeared

*MARIA ROSE FIORENZA*

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

ARTHUR M. SEIDT
NOTARY PUBLIC, State of New York
No. 30-8909225
Qualified in Nassau County
Commission Expires September 30, *2006*

Tax Map Information:

Initials: *MRF*

VMP®-6A(NY) (0005).02                Page 17 of 17                Form 3033 1/01

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this 11th day of May 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
**1336 GILLESPIE AVENUE    BRONX, NY 10461**

[Property Address]

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. INCREASES IN THE INTEREST RATE WILL RESULT IN HIGHER PAYMENTS. DECREASES IN THE INTEREST RATE WILL RESULT IN LOWER PAYMENTS.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 9.000 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the first day of June 2008, and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**MULTISTATE ADJUSTABLE RATE RIDER - Single Family**



-899R (0402)       1/01
Page 1 of 5      Initials: _HRF_
VMP Mortgage Solutions, Inc.
(800)521-7291

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is:

the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the WALL STREET JOURNAL. The most recent Index figure available as of the date: ☒ 45 days ☐ _____ before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six and Seven Hundred Seventy-Nine Thousandths** percentage points ( **6.7790** %) to the Current Index. The Note Holder will then round the result of this addition to the ☒ Nearest ☐ Next Highest ☐ Next Lowest **One-Eighth** ( **0.125** %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

☐ **Interest-Only Period**

The "Interest-only Period" is the period from the date of this Note through **N/A** . For the interest-only period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.

The "Amortization Period" is the period after the interest-only period. For the amortization period, after calculating my new interest rate as provided above, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

Initials: MRE

-899R (0402)                    Page 2 of 5

VACOSTA-06/28/2006

**(D) Limits on Interest Rate Changes**
**(Please check appropriate boxes; if no box is checked, there will be no maximum limit on changes.)**

☐ (1) There will be no maximum limit on interest rate changes.

☒ (2) The interest rate I am required to pay at the first Change Date will not be greater than 11.000          % or less than   9.0000          %.

☒ (3) My interest rate will never be increased or decreased on any single Change Date by more than   One and One-Half
percentage points (          1.5000          %) from the rate of interest I have been paying for the preceding period.

☒ (4) My interest rate will never be greater than   15.0000          %, which is called the "Maximum Rate."

☒ (5) My interest rate will never be less than          9.0000    %, which is called the "Minimum Rate."

☒ (6) My interest rate will never be less than the initial interest rate.

☒ (7) The interest rate I am required to pay at the first Change Date will not be greater than 11.000          % or less than   9.0000          %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than   One and One-Half
percentage points (          1.5000          %) from the rate of interest I have been paying for the preceding period.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

Initials: *H R F*

-899R (0402)                    Page 3 of 5

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: _MRF_

-899R (0402)                         Page 4 of 5

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Maria Rose Fiorenza_ (Seal)
MARIA ROSE FIORENZA    -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

VMP-899R (0402)    Page 5 of 5

# 1-4 FAMILY RIDER
### (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this **11th** day of **May** **2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **FREMONT INVESTMENT & LOAN**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: **1336 GILLESPIE AVE**
**BRONX, NY 10461**

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
**Form 3170 1/01**

VMP®-57R (0411)
Page 1 of 3     Initials: *N A F*
VMP Mortgage Solutions, Inc.
(800)521-7291

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

VMP®-57R (0411)                         Page 2 of 3                    Initials: _H Q E_                    Form 3170 1/01

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_Maria Rose Fiorenza_ (Seal)
MARIA ROSE FIORENZA        -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

VMP-57R (0411)              Page 3 of 3              Form 3170 1/01

# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

HSBC BANK USA, NATIONAL ASSOCIATION AS ----------X
TRUSTEE FOR NOMURA HOME EQUITY LOAN, INC.,
                                    Plaintiff

- against -

Maria Rosa Fiorenza
                                    Defendant,
------------------------------------------X

Index Number

13039 /07

ANSWER

AMENDED

        As and for his/her answer to the complaint herein, the defendant,
Maria Rosa Fiorenza respectfully shows and alleged as follows.
        ___ Admits the truth of the allegations of Paragraph(s) 1, 2, 3
the complaint.

        ___ Denies knowledge or information sufficient to form a belief as
to the truth of the allegations of Paragraph(s) 4-20 of the complaint.
        X  Denies the allegations of Paragraph(s) 11&15 of the complaint.
X GENERAL DENIAL (FRAUD) Contractor Misconduct.
Contractor Set up all the financing at very high rates. Contractor NEVER
Completed the house to the point of certifico on the building. Work that was done, was
not done rite or to NYC Building Depart code. Builder was terminated off job site

        Affirmative Defenses CONTINUES ON THE BACK →

        WHEREFORE, defendant, prays that this Court dismiss the complaint of
the plaintiff herein, with costs and disbursements to defendant, together
with any other relief the Court finds to be just and proper.

Dated 4/11 , 200 7

                                    Maria Rosa Fiorenza
                                    Signature

I, MARIA ROSA FIORENZA
have served this answer upon
the Plaintiff's attorney by
Certified mail, return receipt
requested, on
4/11/07  x

FILED
APR 1 2 2007
BRONX COUNTY CLERK

                                    Print name
                                    MARIA ROSA FIORENZA
                                    26 CRESCENT PLACE
                                    YONKERS, NY 10704 914-237-4891
                                    Address and telephone number

Builder and the
propery, Which are before the court for dismissal on another on going
court case with my self and the builder. Due to this I have not been
able to rent or refinance at all. P.S. I have attached a co
of a newspaper article, For review of the corrector/
misconduct of the builder as well as a copy of the letter used
to terminate the builder from the job site.

VERIFICATION

_Maria Rosa Fiorenza_ , [your name], being duly

sworn,, deposes and says:

I am the defendant. I have read the foregoing answer and know
the contents thereof. The same are true to my knowledge,, except as to
matters therein stated to be alleged on information and belief and as to
those matters I believe them to be true.

Sworn to before me on

_11th_ day of _April_ , 200_7_

_X Maria Rosa Fiorenza_
Defendant
[Sign your name before a Notary]

ANDREW M. BOWMAN
Notary Public, State of New York
No. 4786562
Qualified in Westchester County
Commission Expires _2/28/11_

_X Maria Rosa Fiorenza_
[Print your name]

BRONX Voice REPORTER

VOL. 25 NO. 31

AUGUST 4 - AUGUST 10, 2005

PERIODICALS

WEBSITE www.bronxtimes.com
CLASSIFIEDS PAGES 42-47

# Homeowners: Contractor is a con man

## Duped local residents

by Bobby Ciafardini

"The contractor from hell" is how one resident described your work, as was the case in Emanuel "Jay" Ordine, Jr. — a convicted drug dealer turned contractor who, according to several local homeowners, preys on trusting clients by raking in thousands of dollars before abandoning residential construction projects.

"He takes money from homeowners and doesn't pay carpenters, electricians or any other subcontractors," said James Scarangella, a Hobart Avenue resident who commissioned Ordine's services to build four homes on Hollywood and Hobart avenues in early April 2004, and who lost hundreds of thousands of dollars. "By the end of the project, he owes a number of subcontractors and never finishes my situation."

Scarangella and several other homeowners who claim to have been duped by the 67-year-old Ordine are speaking out in the hope that others learn from their mistakes.

"He starts the construction and completes maybe 40% of the work, constantly asking for more funds," explained Scarangella, who recently testified before the City Council regarding a bill that would require strict licensing with ethics clauses for general contractors. "It gets to the point where you are in so deep that you just keep going and the money you've handed over starts to exceed the work. When that happens, Ordine begins to mess up on purpose, and forces clients to pay for repairs to mistakes he made on the job. Finally, many clients cut their losses, and end up having to find another contractor to finish the work."

Sources said Ordine, who has a number of addresses and goes under the company name J. Ordine Contracting, among others, is being investigated by the Department of Buildings and the city Department of Consumer Affairs.

Linda Santos, another resident of Hobart Avenue, said she contracted Ordine to install a bay window in her home, among other projects, and although she paid Ordine for the window, he didn't pay the subcontractor for the work.

and then the subcontractor comes to my house looking for money," she said. "I met Mr. Ordine when he was working on James Scarangella's home. I live next door to where Mr. Ordine used to rent from Waterbury/LaSalle Community Association president Tony Cannata."

Santos said her husband is handicapped and was in need of a handicap ramp for the entrance to their home, which she also hired Ordine to build. "He didn't do the job to specification," Santos said. "He said he knew how to put in the handicap ramp and he brought me a sketch of how it would look. So I contracted it would look. So I contracted him to do it one year ago. It's still not completed and has to be torn down. I gave him about $265,000 for the facade of the house, doors, the handicap ramp

CONTRACTOR page 36





Residents say contractor Jay Ordine (pictured), a convicted criminal, duped them out of thousands of dollars.

## CONTRACTOR from page 1

and the sidewalk to the front of our home. Then I paid an extra $7,000 to have the work finished by someone else. I have to pay for a new ramp, now, too. I don't even know where Ordine is. He's hard to find."

Ordine, who didn't return calls for comment, is reportedly living in Georgia. His company continues to work on homes in the Throggs Neck area, and several homeowners indicated that he has personally been spotted in the neighborhood several times over the last few months. The frustrated homeowners also said they later found out that Ordine is not a licensed general contractor.

"He has so many addresses and he comes and goes," Scarangella said. "He works the business with his daughter and doesn't have a website or an advertisement in any publication. He charms people and you just find out that he was walked off the job. He just stopped showing up. I have four kids and a wife, and they couldn't live in the house at the time."

Gunman said that Ordine and his work crew also broke the fence surrounding his pool, and failed to fix it despite the fact that Gunman pointed out it himself in Georgia," Willis added. "I didn't believe him, but he

*SOLDIER from page 1*

him," Velez said as tears streamed down her face. "When I look at my son, I can't believe this is a piece of me and of him. I just want him to have an opportunity to hold him and to know what it feels like. There is nothing better than this."

Doctors said the 22-year-old mother from Morris Park, who recently moved to Huntington Avenue in Throggs Neck with her family, endured a rigorous labor at Our Lady of Mercy Medical Center on Wednesday, July 20, giving birth to a 7 lbs, 6 oz. Boy, Alexis, Jr.—who is named after his father, Staff Sergeant Alexis Velez of the Army's Tenth



dier, it never came. "I know he wants to be here, but his military duties won't permit that," his disappointed wife said.

Danielle Velez, who grew up in Kinsella Street, married Alexis three years ago. She said she was always against the war.

"This is my husband's second tour. He finished his term with the Army in August and then enlisted on his own, voluntarily, and was activated in November," explained Velez.

She said she worries about her husband, and looks forward to the day he can finally hold their son in his arms. "There are sudden dates in Iraq every

even walk off with people's money. People tend to use the money. I paid it, then halfway through jobs and commission, him to do work for them. And since he'll only work for cash, 17 years in prison on drug there really isn't a paper trail."

Wayne Gunman, a resident of LaSalle Avenue, said Ordine worked out a payment plan with him for adding a floor to his home.

"He kept sweet-talking me and pleading for more money upfront," Gunman explained. "I was inexperienced and I broke down and gave in. I would say 60% of the work was done, and that 80% of the money was given to him. He was the walked off the job. He just stopped showing up.

"He's a con man and a good one at that," he said.

According to New York State Department of Correctional Services records, Ordine spent 17 years in prison on drug charges and criminal possession of a weapon. He was released in 1996.

Bill Willis, a sub-contractor who lives on Davis Avenue, said Ordine hired him to frame houses on Hobart Avenue. "He ordered the wrong windows," Willis said. "The first payment came upfront and the next time around he cuts back on the money and then eventually he stops paying you all together. I had done all the work and he owed me."

Willis said that Ordine outlined his plans to bilk people out of their money, but he didn't take him seriously. "He told me that he was going to short-change everybody and use the money to build a house for himself in Georgia," Willis added. "I didn't believe him, but he did it."

Willis charged that Ordine purposefully made mistakes on projects to elevate costs, drew out the project or get fired once he received the bulk of the payment for a job.

"He is a lot smarter than people give him credit for," Willis said. "He drags the jobs out and leaves homeowners with nothing - no money and sometimes no house or a house that needs a lot of work."

The city Department of Consumer Affairs fielded around 900 complaints last year about problems with home improvements. The agency regulates 55 different types of businesses and enforces the city's consumer protection law. Yet, home improvements are the top cause for complaints. The agency has increased the number of home improvement contractors with city licenses to approximately 8,700.

Consumer Affairs orders contractors to repay consum-

did it."

Ordine, pictured here slumping his head, has repeatedly threatened homeowners and former clients for calling him a "con man."

ers for problematic renovations, and reimburses homeowners from a special trust fund when contractors in question can't be found. However, the department can only help customers if their contractor has a New York City license.

Norma Velez said the two families are getting by thanks to one small reason. "Alexis, Jr." she said. "He's definitely a blessing. I know the Lord will answer our prayers.

ents and in-laws. "Being that I was able to have my mother-in-law and my father-in-law in place of my husband, and his presence by my side, it made everything easier," she explained. "Everybody was real good to me, and that includes the nurses and doctors.

"I had to undergo a cesarean," she added. "I will never forget when the nurses handed me my son for the first time. I didn't know whether to cry, kiss him, hug him, bite him or scream — I was so overwhelmed, I spoke to my husband briefly this morning and he told me that he wasn't going

the military, but we just want him to come home safely.

"I'm upset — the war is getting worse and worse," added Eleanor Conte, Danielle's mother. "I know there are men who left their families behind, but there are so many first-time fathers that are having children too, and they may never get a

chance to see them. There is no guarantee that they are ever going to get to see their babies. My daughter is devastated."

This homeowner Maria Rose Fiorenza, a single mother obtained this house in 1996. This house was a one family frame structure that was mortgaged initially for $93,700.00 and refinanced in 2003 for $176,000.00. Early 2004, Mrs. Fioreza met a contractor by the name of Jay Ordine, who convinced her to demolish her existing home and build a brick two family, three levels home. This contractor stated he would provide the funding for this new construction. So she refinanced her home in 2005 for $276,000.00, the original mortgage note was satisfied at $196,000.00. The remaining funds were then used for the demolition of the existing structure and building materials. The broker who arranged this loan stated that he would provide the remaining funding for the full construction of this two family house. Some months later the broker claimed the bank was unable to provide them with the remaining construction loan. At this time Ms Fioreza had no home, a 275,000 mortgage and no financing to complete the project. After many attempts to secure funding failed, the only lender that agreed to provide funding was a private lender the Stillwater Asset Based Fund, LLP who agreed to a construction loan of $300,000.

This loan was for a period of six months at 18% interest with four draws, of which 50,000 was set aside for mortgage payments and closing cost. The remaining funds were to be used for the completion of this two family house. This is when the contractor started to swindle Ms. Fiorenza. The work was now being delayed, some work had to be redone, and subcontractors were coming to her for payments. The NYC Department of building found a lot of the work to be faulty, requiring correction. The contactor Mr. Ordine persuaded the lender to release money for work what was not completed. Mrs. Fiorenza was stuck paying two mortgages for a total of $575,000. After the project pass the six month time frame and the house was still not completed and many of the short comings of this project were now showing, she decided to terminate the contact with this crooked scam artist and try to complete the project with someone else. The construction loan was owed, and Ms. Fioreza was forced to consolidate both loans into one loan for a total of $634,500 with Fremont Investment and Loan. This loan is far more than what she can afford to pay. She is now five months behind with her mortgage payment, with an active foreclosure, on a house that is not completed. She will need a Certificate of Occupancy in order for her to move into it.

The contactor Emanuel"Jay" Ordine date of birth is 3/8/1948. He was arrested for drug sale and was incarcerated from 1972 until 2001. A cover story of his illegal construction home improvement scams was documented in the Bronx Times dated August 4 to August 10, 2005. In this article Mr. Ordine routinely entered contacts with homeowners starts the construction work and complete the majority of the work and would skip out on the job after using up all the construction funding. After he is gone you find out that he did not pay carpenters, electricians and other subcontractors. This contractor is a con artist who has duped many homeowners out of thousands of dollars.

Maria Fiorenza monthly net income is approximately $2,100.00, and she receives $862.00 from Social Security death benefits. Her adult son John is a bus driver. He is financially assisting her, his monthly income is approximately $1,600.00, and the total household income is $4,562.00 a month. Her mortgage payments are $5,483.01 a month.

Ms. Fiorenza is living in Yonkers in her sister's basement until her home is completed.

To whom it may concern,

In early 2004 I was approached by a crooked contractor to demolish my existing one family home, and he promised to build a new 2 family home on the property. I was convinced to get new plans for the new construction and the contractor had arranged all of the financing. He also had arranged for us to finance the home under his broker. The broker was supposed to get us a construction loan, but instead got us a refinance with money out. So the mortgage of $195K was paid off + closing costs as well as commission for arranging the loan. The remaining funds of $60K were used to illegally demolish the existing building, as well as buy the bricks and cement to build the home. The broker had stated to me that once construction began he had that was interested in coming in and taking care of the rest of the construction loan. That never happened, the broker claimed that the bank that was supposed to take over the loan rejected the offer to fund the rest of the project. At this point I had no house, no financing to continue the project, and a $275K mortgage. 4 months went by and no progress was made. After much pressure from myself and my family the broker tried to get a construction loan, but no bank would accept it because construction was already started. The only lenders that would accept it were hard money lenders. I had no choice but to settle with a short term hard money loan of $300K at 18% interest for 6 months with 4 draws set up. A $50K sum was used for 6 months as reserved mortgage payments as well as closing costs. The rest of the $235K was used for construction as a construction loan. This was around the time that the crooked contractor started to rip me off. He never completed the project, and a lot of the work he completed was faulty and done wrong, and not built to NYC Building Code. I suspected him of illegally paying off NYC Department of Buildings inspectors to pass all the inspections conducted. He would also try to persuade the lender to release money for work that was not done. He dragged the draw process out to about 7 draws. He also would not show up at the site for weeks at a time. 6 months had come and passed and the home was still not even close to being completed. Then he started asking me for more money. I reflected on a lot of things. I had 2 mortgages which totaled $575K. I terminated his contract on the job and arranged financing to pay off the 2 mortgages. My plan was to complete the house, rent the units and thus pay off my mortgages. But the plan is taking longer than expected, the house is STILL not complete and I have fallen behind on my mortgage payments.

Thank you,

Maria R. Giorkuzo

# EXHIBIT F

SUPREME COURT: BRONX COUNTY
STATE OF NEW YORK
-----------------------------------------------------x
HSBC Bank USA, National Association as
Trustee for Nomura Home Equity Loan,
Inc. Asset-Backed Certificate, Series
2006-FMA

                              Plaintiff,

       -against-

Maria Rose Fiorenza, et al.

                        Defendants.
-----------------------------------------------------x

VERIFIED AFFIDAVIT
IN OPPOSITION TO
MOTION FOR SUMMARY
JUDGMENT

Index #13039/07

State of New York)
                ss.:
County of Bronx  )

      MARIA ROSE FIORENZA, being duly sworn deposes and says:

      1.     I am one of the defendants in connection with the above-captioned

proceeding.

      2.     I make this affidavit in opposition to plaintiffs' motion for summary

Judgment, striking the Answer of Defendant Maria Rose Fiorenza and for an Order

appointing a Referee based upon my personal knowledge of the facts herein and upon all

prior pleadings had herein heretofore.

      3.     Your deponent respectfully recognizes the need for the Plaintiff to receive

satisfied in full for any and all outstanding mortgage payments.

      4.     However, as stated by deponent in her Amended Answer, which was

prepared *pro* se, deponent was the victim of fraud practiced upon her by an unlicensed

contractor whom has a history of illegal construction home improvement scams as

documented in the Bronx Times dated August 4, 2005, has not only not completed the

work that he was retained for and paid hundreds of thousands of dollars, but the contractor also steered her to a hard money lender (Stillwater Asset Based Fund, LLP) at 18% interest that resulted in your deponent having to take out the mortgage involved herein to satisfy the prior mortgage. All the while, your deponent was not represented by counsel as the contractor advised her that she did not need her own counsel. A copy of said Amended Answer is attached hereto as Exhibit A.

5.     Based upon the situation that your deponent finds herself, your deponent has researched her viable options and has applied for a rescue loan to the National Community Reinvestment Coalition (NCRC). NCRC, located at 727 15th Street NW, Suite 900, Washington, D.C. 20005 (telephone #202-628-8866) is a national entity that provides rescue loans to consumers who have been taking advantage of through predatory lending practices. A thorough detailed timeline description of the facts that have lead up to this point in time is included in said application. A copy of said application is annexed hereto as Exhibit B.

6.     Your deponent has applied for a rescue loan that would satisfy the outstanding mortgage with Plaintiff. Your deponent must first obtain a Certificate of Occupancy, which was the original contractors' responsibility. Your deponent has engaged the services of a different contractor to complete the required work in order to obtain said Certificate of Occupancy, which your deponent has been advised will be issued promptly.

7.    Additionally, your deponent also must vacate several mechanic's liens that have been improperly filed by the initial contractor and his sub-contractors, all of whom were unlicensed. Your deponent has retained the services of an attorney to move to vacate said mechanic's liens.

8.    Your deponent firmly believes that shortly she will be in a position to obtain the mortgage from NCRC in order to satisfy the outstanding mortgage in full in order to preserve your deponents' home and main personal asset.

9.    Your deponent is simply requesting forebearance on the part of the Plaintiff so that your deponent can rectify the problems caused by the initial contractor and predatory lender that your deponent is suffering through.

10.    Currently, as stated above, there is not a valid Certificate of Occupancy for the property. As such, it is very unlikely that Plaintiff would be able to obtain a significant foreclosure auction price in order to satisfy the outstanding mortgage in full. Thus, forebearance on the part of Plaintiff, in order for your deponent to obtain the Certificate of Occupancy and rescue loan, would benefit Plaintiff economically, as your deponent will shortly be ready, willing and able to satisfy the outstanding mortgage in full.

11.    Your deponent recognizes the gravity of this proceeding as she is in great danger of losing her home at a foreclosure auction. As such, your deponent is working tirelessly to solve the problems and obtain a solution via the NCRC rescue loan program.

12.    In the event the requested forebearance is granted, your deponent will maintain consistent communication with Plaintiff to provide status updates and progress reports.

WHEREFORE, defendant MARIA ROSE FIORENZA respectfully requests that plaintiffs motion for summary judgment be denied or, in the alternative, that plaintiff forebear for further action for a reasonable time period to allow defendant MARIA ROSE FIORENZA to obtain a mortgage from the NCRC rescue loan program in order to satisfy plaintiffs' outstanding mortgage.

Dated: July 9, 2007
      Bronx, New York

                                        Maria Rose Fiorenza
                                        Maria Rose Fiorenza

## VERIFICATION

STATE OF NEW YORK)
                    ss.:
COUNTY OF BRONX   )

I, the undersigned, MARIA ROSE FIORENZA, herein, being duly sworn, say: I have read the foregoing Affidavit and know the contents thereof, and the same is true to our own knowledge except as to the matters therein stated to be alleged on information and belief, and as to those matters we believe it to be true.

_Maria Rose Fiorenza_
Maria Rose Fiorenza

On July 10, 2007, before me, the undersigned, personally appeared Maria Rose Fiorenza personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

JAMES G. STRIAR
Notary Public, State of New York
No. ~~02STS065367~~ 02ST6159772
Qualified in Westchester County
Commission Expires ~~September 18, 2008~~ 1/24/11

# EXHIBIT  G

NEW YORK SUPREME COURT - COUNTY OF BRONX

PART 19

| | |
|---|---|
| Case Disposed | ☐ |
| Settle Order | ☐ |
| Schedule Appearance | ☐ |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX:
-----------------------------------------------------------X

HSBC BANK, USA

              -against-

**FIORENZA ROSE MARIA**

-----------------------------------------------------------X

Index Nº.   0013039/2007

Hon..**LUCINDO SUAREZ**   ,

                              Justice.

The following papers numbered 1 to _7_ Read on this motion, **REF TOCOMPUTE**
Noticed on **June 27 2007** and duly submitted as No. _37_ on the Motion Calendar of _July 18, 2007_

| | PAPERS NUMBERED | |
|---|---|---|
| Notice of Motion - Order to Show Cause - Exhibits and Affidavits Annexed | 1, 2, 3 | |
| Answering Affidavit and Exhibits | 4, 5 | |
| Replying Affidavit and Exhibits | 6 | |
| Affidavits and Exhibits | | |
| Pleadings - Exhibit | | |
| Stipulation(s) - Referee's Report - Minutes | | |
| Filed Papers | | |
| Memoranda of Law | 7 | |

Upon the foregoing papers this   motion by plaintiff for, *inter alia*, summary judgment is
    disposed of in accordance with the annexed decision and order.

Respectfully Referred to: _____

Dated: _____

Dated: _09 / 13 / 07_

Hon. _____

              **LUCINDO SUAREZ, J.S.C.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX: I.A.S. PART 19
------------------------------------------------------------------X

HSBC BANK USA, NATIONAL ASSOCIATION AS
TRUSTEE FOR NOMURA HOME EQUITY LOAN,
INC. ASSET-BACKED CERTIFICATES, SERIES
2006-FM2,

DECISION AND ORDER

Index No. 13039/2007

Plaintiff,

- against -

MARIA ROSE FIORENZA; NICOLE ORDINE d/b/a
ORDINE CONTRACTING COMPANY; JAN
VASSALOTTI; STREAMLINE WINDOWS, INC.;
NEW ELJAM PRODUCTS, INC.; CITY OF NEW
YORK ENVIRONMENTAL CONTROL BOARD;
"JOHN DOE #1" through "JOHN DOE #10" inclusive,
the names of the ten last name Defendants being
fictitious, real names unknown to the Plaintiff, the parties
intended being persons or corporations having an interest
in, or tenants or persons in possession of, portions of the
mortgaged premises described in the complaint,

Defendants.

------------------------------------------------------------------X

PRESENT: Hon. Lucindo Suarez

Upon plaintiff's notice of motion dated June 5, 2007 and the memorandum of law, affirmation

and exhibits submitted in support thereof; defendant's affidavit in opposition dated July 9, 2007 and the

exhibits annexed thereto; plaintiff's reply affirmation dated July 16, 2007; and due deliberation; the

court finds:

Plaintiff, on its motion for summary judgment in this foreclosure action, "presented a prima facie

right to foreclosure by producing the mortgage documents and undisputed evidence of defendant's

nonpayment." *See LPP Mortg., Ltd. v. Card Corp.*, 17 A.D.3d 103, 104, 793 N.Y.S.2d 346, 346 (1st

Dep't 2005), *reargument denied*, 2005 N.Y. App. Div. LEXIS 6975 (1st Dep't June 16, 2005), *appeal*

*denied*, 6 N.Y.3d 702, 843 N.E.2d 1156, 810 N.Y.S.2d 417 (2005). In opposition, defendant acknowledged the debt and nonpayment and requested plaintiff's forbearance, claiming wrongdoing by a contractor that deprived her of the income with which she intended to pay the mortgage. *See Gould v. McBride*, 36 A.D.2d 706, 319 N.Y.S.2d 125 (1st Dep't 1971), *affirmed*, 29 N.Y.2d 768, 276 N.E.2d 626, 326 N.Y.S.2d 565 (1971). There is no allegation imputing this wrongdoing to plaintiff, or that plaintiff did or should have known of such wrongdoing and was complicit in same. *See Prudential-Bache Secur., Inc. v. Citibank, N.A.*, 73 N.Y.2d 263, 536 N.E.2d 1118, 539 N.Y.S.2d 699 (1989). Nor is there any claim that completion of any contractor's work as a condition precedent for payment was within the parties' contemplation. While defendant's circumstances may be regrettable, defendant has failed to raise a triable issue of fact with respect to the allegations contained in the complaint. *See East New York Sav. Bank v. Carlinde Realty Corp.*, 54 A.D.2d 574, 387 N.Y.S.2d 138 (2d Dep't 1976), *affirmed*, 42 N.Y.2d 905, 366 N.E.2d 1357, 397 N.Y.S.2d 1003 (1977).

Plaintiff has advanced no argument meriting the striking of defendant's answer, prepared *pro se*. While the answer was perhaps inartfully drafted, plaintiff makes no claim that its rights have been prejudiced by the answer.

Accordingly, it is

ORDERED, that plaintiff's motion to strike defendant's answer is denied; and it is further

ORDERED, that plaintiff's motion to amend the caption is granted; and it is further

ORDERED, that the amended caption of the action shall read as follows:

[This space intentionally left blank.]

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
------------------------------------------------------------X

HSBC BANK USA, NATIONAL ASSOCIATION AS
TRUSTEE FOR NOMURA HOME EQUITY LOAN,
INC. ASSET-BACKED CERTIFICATES, SERIES
2006-FM2,

Index No. 13039/2007

Plaintiff,

- against -

MARIA ROSE FIORENZA; NICOLE ORDINE d/b/a
ORDINE CONTRACTING COMPANY; JAN
VASSALOTTI; STREAMLINE WINDOWS, INC.;
NEW ELJAM PRODUCTS, INC.; CITY OF NEW
YORK ENVIRONMENTAL CONTROL BOARD,

Defendants.
------------------------------------------------------------X

and it is further

ORDERED, that plaintiff's motion for summary judgment is granted; and it is further

ORDERED, that this action is referred to Harry M. Forman, Esq., 888 Grand Concourse, Apt.

IK, Bronx, New York 10451, tel. no. (718) 292-5299, as referee to ascertain, compute and report to the

court the amount due to the plaintiff for principal, interest and other disbursements advanced as provided

for in the note and mortgage upon which the action is based, and to examine and report to the court

whether or not the mortgaged premises can be sold in parcels, and it is further

ORDERED, that the referee shall report his/her findings to the court with all convenient speed;

and it is further

ORDERED, that by accepting this appointment, the referee certifies compliance with all

provisions of Part 36 of the Rules of the Chief Judge (22 NYCRR §§ 36.0 *et seq.*).

This constitutes the decision and order of the court.

Dated: September 13, 2007

Lucindo Suarez, J.S.C.

3

# EXHIBIT H

NEW YORK SUPREME COURT - COUNTY OF BRONX

**PART 19**

| | |
|---|---|
| Case Disposed | ☒ |
| Settle Order | ❑ |
| Schedule Appearance | ❑ |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX:
-------------------------------------------------------------------X

**HSBC BANK USA, N.A.,**

Index №. <u>13039/2007</u>

- against -

Hon. **LUCINDO SUAREZ,**

Justice.

**MARIA ROSE FIORENZA, et al.**
-------------------------------------------------------------------X

The following papers numbered 1 to 8 read on this motion to vacate the judgment of foreclosure and sale signed by this court on December 6, 2007, Noticed on February 28, 2008 and duly submitted on March 14, 2008:

| | PAPERS NUMBERED | |
|---|---|---|
| Order to Show Cause – Affirmation, Affidavit and Exhibits Annexed | 1-4 | |
| Affirmation in Opposition and Exhibits Annexed | 5-6 | |
| Supplemental Affirmation and Exhibits Annexed | 7-8 | |

Upon the foregoing papers this motion by defendant Maria Rose Fiorenza to vacate the judgment of foreclosure and sale and for other relief is denied, as stated in the annexed decision and order.

APR - 9 2008

Dated: <u>03/24/2008</u>

Hon.
**LUCINDO SUAREZ, J.S.C.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX: I.A.S. PART 19

------------------------------------------------------------------X

HSBC BANK USA, N.A. as trustee for Nomura
Home Equity Loan, Inc. Asset Backed Certificates,
Series 2006-FM2,

<u>DECISION AND ORDER</u>

Index No. 13039/2007

Plaintiff,

- against -

MARIA ROSE FIORENZA, NICOLE ORDINE
d/b/a ORDINE CONTRACTING COMPANY, JAN
VASSALOTTI, STREAMLINE WINDOWS, INC.,
NEW ELJAM PRODUCTS, INC., CITY OF NEW
YORK ENVIRONMENTAL CONTROL BOARD,

Defendants.

------------------------------------------------------------------X

PRESENT: Hon. Lucindo Suarez

　　　　Upon the order to show cause dated February 20, 2008 and the affirmation, affidavit and

exhibits in support thereof; the March 12, 2008 affirmation in opposition and the exhibits

annexed thereto; the March 13, 2008 supplemental affirmation of defendant Maria Rose

Fiorenza's attorney and the exhibits annexed thereto; and due deliberation; this court finds:

　　　　Defendant Maria Rose Fiorenza ("Fiorenza") moves to vacate a judgment of foreclosure

and sale signed by this court on December 6, 2007; for leave to serve a second amended answer

asserting various defenses pursuant to the Truth in Lending Act [15 U.S.C. §1601 et seq.],

General Business Law §349 and other claims, including rescission of the mortgage and note; and

to stay the foreclosure action and sale of the premises pending resolution of her claims in an

action commenced by her in United District Court for the Southern District of New York.

　　　　Fiorenza asserts, in her proposed second amended answer, similar claims as she has

asserted in the action she commenced in Federal Court.  The evidence, including the answers she

filed in this action and her opposition to plaintiff's motion for summary judgment, demonstrates that Fiorenza apparently has decided to alter her previously interposed unsuccessful defense, *viz.*, that the contractor who performed renovation work on her house did not finish the job, so that she was unable to derive expected rental income with which to make her payments on the mortgage note. Fiorenza's belated assertion that she did not receive certain disclosures as required by the Truth in Lending Act is insufficient to warrant setting aside the judgment. Fiorenza does not dispute that on May 11, 2006, at the closing, she was given a form entitled "Notice of Right to Cancel" which states, in accordance with 15 U.S.C. 1635(a), that she had until May 15, 2006 to cancel the transaction. *See Mortgage Electronic Registration Systems, Inc. v. Maniscalco*, 46 A.D.3d 1279, 848 N.Y.S.2d 766 (3d Dep't 2007). The prejudice to plaintiff if the court were to permit Fiorenza to engage in this piecemeal assertion of defenses is manifest. *See O'Connell v. Corcoran*, 1 N.Y.3d 179, 802 N.E.2d 1071, 770 N.Y.S.2d 673 (2003). Although present counsel states that Fiorenza was never provided with a fair chance to oppose plaintiff's motion for a judgment of foreclosure and sale, and that the resultant judgment was entered on default, the court notes that Fiorenza was assisted by counsel, James G. Striar, Esq., and that she opposed plaintiff's summary judgment motion. The court rejected her asserted claims as not proper defenses against plaintiff, and mailed a copy of the decision and order granting the motion to Mr. Striar. No notice of appeal of that order was filed by Fiorenza.

Fiorenza's present counsel incorrectly asserts that Fiorenza should be permitted to set aside the judgment of foreclosure and sale on the ground of "excusable default." There was no default which resulted in the grant of plaintiff's summary judgment motion; this court considered Fiorenza's stated defenses and found that they were without merit. While the cover sheet dated

2

December 6, 2007 states that the motion was granted on default, that default refers merely to Fiorenza's lack of opposition to the referee's calculations, since the court had already considered Fiorenza's opposition to the motion for summary judgment, as stated in the decision and orders dated September 3, 2007 and October 22, 2007 granting plaintiff's motion. Fiorenza does not now dispute the referee's calculations.

Accordingly, it is

ORDERED, that the motion of defendant Maria Rose Fiorenza to vacate the judgment of foreclosure and sale, to permit said defendant to interpose a second amended answer, and to stay the judgment of foreclosure and sale of the premises pending resolution of her claims in an action commenced by her in United District Court for the Southern District of New York is denied; and it is further

ORDERED, that the temporary stays contained in the order to show cause signed on February 20, 2008, restricting plaintiff and Harry Forman, Esq., the court appointed referee, from proceeding with the foreclosure and sale, are vacated; and it is further

ORDERED, that the foreclosure sale of the premises may be renoticed by Harry Forman, Esq., the court appointed referee.

This constitutes the decision and order of the court.

Dated: March 24, 2008

Lucindo Suarez, J.S.C.

3

**EXHIBIT I**

At the _IAS_ Part _19_ of the Supreme
Court of the State of New York, County of
Bronx, 851 Grand Concourse, Bronx, New
York, on the _20TH_ day of _FEBRUARY_
2008.

PRESENT:    **HON. LUCINDO SUAREZ**

Hon. _____

Justice

------------------------------------------------------------x

HSBC BANK USA, NATIONAL ASSOCIATION       Index No.: 13039/07
AS TRUSTEE FOR NOMURA HOME EQUITY
LOAN, INC. ASSET-BACKED CERTIFICATES,       **ORDER TO**
SERIES 2006-FM2,                            **SHOW CAUSE**

Plaintiff,

-against-

MARIA ROSE FIORENZA, NICOLE ORDINE
D/B/A ORDINE CONTRACTING COMPANY;
JAN VASSALOTTI; STREAMLINE WINDOWS,
INC., NEW ELJAM PRODUCTS, INC,; CITY
OF NEW YORK ENVIRONMENTAL
CONTROL BOARD,

Defendant(s).

------------------------------------------------------------x

Upon reading and filing the annexed Emergency Affirmation of DAVID M.

HARRISON, ESQ., dated February 15, 2008; the Affidavit of the defendant,

MARIA ROSE FORENZA, dated February 1, 2008, together with all exhibits

annexed hereto; and there being sufficient cause appearing, and upon all the prior

pleadings, papers and proceedings heretofore had herein,

Let the Plaintiff named in the above-entitled action, its agents/assigns and/or

attorney, show cause at an IAS Part __19__ _Room 411_ of the Supreme Court of the State of

New York, County of Bronx, to be held at the Courthouse located at 851 Grand

Concourse, Bronx, New York, on the __28TH__ day of _FEBRUARY_, 2008, at

~~9:30 A.M.~~ _1:00 P.M._ of that day, or soon thereafter as counsel can be heard, why an order should

not be rendered: **(i)** Staying the foreclosure sale of the premises upon which this action

is based (1336 Gillespie Avenue, Bronx, New York), scheduled for March 3, 2008,

pursuant to the "Judgment of Foreclosure and Sale" rendered by the Honorable Court

on or about December 6, 2007; **(ii)** vacating the Honorable Court's prior order entitled

"Judgment of Foreclosure and Sale" (rendered by the Honorable Court on or about

December 6, 2007), as against the defendant MARIA ROSE FIORENZA, pursuant to

CPLR 5015(a); and, **(iii)** permitting defendant MARIA ROSE FIORENZA to interpose

an Amended Answer, pursuant to CPLR 3025(b), for the purposes of raising certain

affirmative defenses based upon the Federal Truth In Lending Act, as set forth by

15 U.S.C. 1601 et Seq. and Regulation Z, as well as The New York State Deceptive

Acts and Practices Statute, as set forth by Section 349 of the New York State General

Business law; and vacating the Honorable Court's prior October 22, 2007 Order

granting plaintiff summary judgment on the subject foreclosure action, by reason of there

being triable issues of fact with respect to the allegations raised within plaintiff's

complaint; or alternatively, **(iv)** staying all proceedings on the subject action, pursuant

to CPLR 2201 and CPLR 3211(a)(4) by reason of those claims raised by defendant

MARIA ROSE FIORENZA in the action entitled: Maria Rose Fiorenza, Plaintiff, v.

Fremont Investment & Loan, HSBC Bank USA, National Association as Trustee for

Nomura Home Equity Loan Inc. Asset-Backed Certificates, Series 2006 –FM2 and Grace

M. Pellegrino, D/B/A/ GMP Financial Services (venued in United States District Court,

Southern District, pursuant to Docket No.: 08-8658); and for such other and further relief

as this Court deems just, proper and equitable; and sufficient cause appearing; and,

**IT IS ORDERED**, that pending the hearing of this motion, plaintiff herein

and/or the court-appointed referee to this matter, Harry Forman, Esq., are stayed from

proceeding with a foreclosure sale of the residential premises upon which this action

is based (1336 Gillespie Avenue, Bronx, New York); and/or from transferring the

deed to said residential premises to any party.

**SUFFICIENT REASON THEREFORE APPEARING**, let express mail/

overnight service, as well as an immediate facsimile of a Copy of this Order, together

upon which the papers upon which it is granted, upon counsel for the plaintiff

(Knuckles & Komosinski, P.C.) and the court-appointed referee, Harry Forman, Esq.,

on or _____ before the 21ST day of February , 2008, be deemed

good and proper service.

ENTER

J.S.C.

HON. LUCINDO SUAREZ

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-----------------------------------------------------------------x

HSBC BANK USA, NATIONAL ASSOCIATION          Index No.: 13039/2007
AS TRUSTEE FOR NOMURA HOME EQUITY
LOAN, INC. ASSET-BACKED CERTIFICATES,        **EMERGENCY**
SERIES 2006-FM2,                             **AFFIRMATION**

                          Plaintiff,

             -against-

MARIA ROSE FIORENZA, NICOLE ORDINE
D/B/A ORDINE CONTRACTING COMPANY;
JAN VASSALOTTI; STREAMLINE WINDOWS,
INC.; NEW ELJAM PRODUCTS, INC.; CITY
OF NEW YORK ENVIRONMENTAL
CONTROL BOARD,

                          Defendant(s).

-----------------------------------------------------------------x

    **DAVID M. HARRISON, ESQ.**, an attorney duly admitted to practice law before

the Courts of the State of New York, affirms under penalty of perjury as follows:

    1.  That I am the attorney for the defendant, MARIA ROSE FIORENZA, in the

above-entitled action and, as such, am fully familiar with the facts and circumstances

heretofore had herein, based upon file material maintained in your affirmant's office.

    2.  This Emergency Affirmation is respectfully submitted in support of the

instant application, by order to show cause: **(i)** Staying the foreclosure sale of the

premises upon which this action is based (1336 Gillespie Avenue, Bronx, New York),

scheduled for March 3, 2008, pursuant to the "Judgment of Foreclosure and Sale"

rendered by the Honorable Court on or about December 6, 2007; **(ii)** vacating the

Honorable Court's prior order entitled "Judgment of Foreclosure and Sale" (rendered

by the Honorable Court on or about December 6, 2007), as against the defendant

MARIA ROSE FIORENZA, pursuant to CPLR 5015(a); and, **(iii)** permitting

defendant MARIA ROSE FIORENZA to interpose an Amended Answer, pursuant

to CPLR 3025(b), for the purposes of raising certain affirmative defenses based upon

the Federal Truth In Lending Act, as set forth by 15 U.S.C. 1601 et Seq. and

Regulation Z, as well as The New York State Deceptive Acts and Practices Statute,

as set forth by Section 349 of the New York State General Business law; and vacating

the Honorable Court's prior October 22, 2007 Order granting plaintiff summary

judgment on the subject foreclosure action, by reason of there being triable issues of fact

with respect to the allegations raised within plaintiff's complaint; or alternatively,

**(iv)** staying all proceedings on the subject action, pursuant to CPLR 2201 and

CPLR 3211(a)(4) by reason of those claims raised by defendant MARIA ROSE

FIORENZA in the action entitled: Maria Rose Fiorenza, Plaintiff, v. Fremont Investment

& Loan, HSBC Bank USA, National Association as Trustee for Nomura Home Equity

Loan Inc. Asset-Backed Certificates, Series 2006 –FM2 and Grace M. Pellegrino, D/B/A/

GMP Financial Services (venued in United States District Court, Southern District,

pursuant to Docket No.: 08-8658); and for such other and further relief as this Court

deems just, proper and equitable.

3. The foregoing foreclosure action was filed by the plaintiff, HSBC BANK

USA, NATIONAL ASSOCIATION AS TRUSTEE FOR NOMURA HOME EQUITY

hereinafter referred to as "plaintiff HSBC". Plaintiff commenced this matter by filing

of its Summons and Complaint, with the office of the County Clerk, County of Bronx, on or about March 19, 2007. Plaintiff HSBC alleges in its complaint that defendant MARIA ROSE FIORENZA is wrongfully in default on a mortgage held by the plaintiff, secured by defendant's residential premises commonly known and designated as 1336 Gillespie Avenue, Bronx, New York. Plaintiff in its Complaint seeks foreclosure and/or the right to sell said residential premises. Annexed hereto and made a part hereof as **Exhibit "1"** is a duplicate copy of Plaintiff's Summons and Complaint.

    4. The subject mortgage arises from a loan issued to defendant MARIA ROSE FIORENZA by Fremont Investment & Loan (on or about May 11, 2006), secured by defendant's residential premises located at 1336 Gillespie Avenue, Bronx New York. The original principal balance of this loan was $634,500. **The transaction constituted a combined refinancing of two prior mortgages** (held by Ocwen Federal Bank, in the amount of $278,697.17 and The Stillwater Asset Backed Fund, LP, in the amount of $310,152.55). **The subject loan transaction consisted of an Adjustable Rate Mortgage.** During the first two years of this loan, the applicable yearly interest rate was **9.000%.** This interest rate was subject to a change in the interest rate to **11.000%** (with such interest rate not to be higher than **11.000%** or lower than **9.000%**). Thereafter, after every year, the interest rate would be subject to change, with said applicable rate being between **9.000%** and **15.000%.** The processing of this loan was administered, in part, by a "broker", acting on behalf of Fremont Investment & Loan. This "broker" was Grace M. Pellegrino, D/B/A GMP Financial Services. The date of "closing" of the subject loan, as reflected by documents received by defendant MARIA

ROSE FIORENZA, was May 11, 2006. Annexed hereto and made a part hereof as **Exhibit "2"** are duplicate copies of the documents entitled "Mortgage and Adjustable Rate Note" rendered by Fremont Investment & Loan, provided to defendant MARIA ROSE FIORENZA on the date of closing.

5. **As set forth in the annexed Affidavit executed by defendant MARIA ROSE FIORENZA, neither Fremont Investment & Loan nor Grace Pellegrino provided defendant MARIA ROSE FIORENZA with any disclosure concerning either the nature of the loan, or its resultant material terms, <u>at any time prior to the date of "closing" of the subject loan</u>.** Fremont Investment & Loan did not provide defendant with any preliminary disclosure concerning the subject loan's "Annual Percentage Rate"; "Finance Charge"; "Amount Financed" ; "Number of Payments" or "Total of Payments". Furthermore, at no time prior to the date of closing of the subject transaction did defendant "MARIA ROSE FIORENZA receive any disclosure concerning the adjustable rate status of the subject mortgage loan.

6. The Federal Truth In Lending Act (hereinafter referred to as "The Act"), as set forth by 15 U.S.C. § 1601, and Federal Reserve Regulation Z, 12 C.F.R § 226 (which implements the Act) sets forth the procedure which a lender must follow in providing disclosure about a loan to a prospective borrower. The Act requires a lender to provide such disclosures not only on the date of consummation of a transaction; <u>but also prior to said date</u>. The preliminary disclosure which lenders are mandated to provide on closed-end mortgage loans secured by one's residential dwelling includes information as to: **(i)** The "Annual Percentage Rate" applicable to

the loan; **(ii)** The "Finance Charge" applicable to the loan; **(iii)** The "Amount Financed" applicable to the loan; **(iv)** The total number of payments to be made on the subject loan; **(v)** The payment schedule on the subject loan (15 U.S.C. § 1638). These disclosures are required to be made *"before the credit is extended"* (15 U.S.C. § 1638(b); and even more specifically: *"(a) before consummation or (b) within three business days after the creditor receives the consumer's written application, whichever is earlier"* (Regulation Z § 226.19). If such disclosures are not provided by the lender to the borrower prior to the date of closing of the loan, a borrower can be deemed entitled to statutory damages and attorney fees as set forth by the Act, as well as actual damages (15 U.S.C. § 1640).

**Furthermore, a creditor's violation of timing requirements may be a basis for a borrower exercising an extended right to rescind and/or cancel the subject loan.** The Act, as dictated by 15 U.S.C. § 1635; Regulation Z § 226.15(a)(3) and Regulation Z § 226.23 (a)(1), clearly provides a consumer with an extended right to rescind and/or cancel a loan when mandated "material disclosures" are not properly delivered to the consumer. See also <u>Truth In Lending</u>, National Consumer Law Center/ Sixth Edition, by Elizabeth Renuart and Kathleen Keest (2007). <u>**A consumer's right to rescind a mortgage can extend up to three years after consummation if a creditor fails to properly provide material disclosures**</u>. The five material disclosures that must always be properly disclosed for closed end transactions in order to terminate a consumer's right to cancel (after the initial three day period set forth by 15 U.S.C. § 1635), are the applicable: **(i)** "Annual Percentage Rate"; **(ii)** "Finance Charge"; **(iii)** "Amount

Financed"; **(iv)** "Total of Payments"; **(v)** "Payment Schedule" (15 U.S.C. § 1638). This information is to be provided in a Federal Truth In Lending Statement which "clearly and conspicuously" provides such disclosure; and which places particular emphasis on the loan's "Annual Percentage Rate" and "Finance Charge" (15 U.S.C. § 1638; 15 U.S.C. § 1602(u) and Regulation Z § 226.23(a)(3). **The failure on the part of a lender to provide such disclosure prior to the date of closing results in an extended right to rescind on behalf of the consumer** (15 U.S.C. § 1635).

7.   The Federal Truth In Lending Act also sets forth special early disclosure provisions for mortgage loans which contain variable rate features.  For all such loan transactions, a creditor is required to provide disclosure concerning the following information: **(i)** The circumstances under which the rate may increase; **(ii)** Any limitations on the increase in the applicable interest rate; **(iii)** The effect of an increase; **(iv)** An example of the payment terms that would result from an increase (Regulation Z § 226.18(f) (1).  These disclosures must be "given" to a prospective borrower " **(a)** before consummation; or **(b)** within three business days after the creditor receives the consumer's written application, whichever is earlier" (Regulation Z § 226.19(a)(1).  **As set forth in her Affidavit, at no time prior to the date of closing of the subject loan did defendant MARIA ROSE FIORENZA receive such disclosures.**

Furthermore, defendant MARIA ROSE FIORENZA did not receive any required early adjustable rate disclosures which a creditor is obligated to provide a borrower on loans secured by the borrower's principal dwelling (Regulation Z § 226.19(b).  **The**

Act clearly mandates that special Adjustable Rate Mortgage disclosures, including the "ARM brochure", be provided to prospective borrowers when an application form is furnished or before the payment of a non-refundable fee, whichever is earlier (Regulation Z § 226.19(b). See also Truth In Lending, National Consumer Law Center/Sixth Edition, by Elizabeth Renuart and Kathleen Keest (2007). In addition to the "ARM brochure", creditors are also required to clearly reveal detailed, specific information about major aspects of any variable rate loan program for which the consumer is either applying for or considering. Ibid Such requirements are shown in sample form H-14 in Appendix H of the Regulation and model clauses which are also included in Appendix H-4. Ibid. Creditors are required to identify the index to which interest rate changes are tied, or provide a brief description of the formula to be utilized in calculating changes to the interest rate if no index is used. (Regulation Z § 226.19(b)(2)(ii). A credible source of information about an index must also be disclosed. Ibid. Regulation Z also requires an explanation as how the interest rate and resultant payment will be determined. Ibid. Creditors are also required to exchange a statement upon the consumer which suggests that consumers ask for the current margin value and interest rate. Ibid. The disclosures must also alert consumers about a discount feature whenever the initial interest rate is discounted, and must also contain a statement which suggests that consumers ask for the amount of the applicable interest rate discount. Ibid. The frequency of rate and payment adjustments must also be disclosed, along with rate and payment caps. Ibid. The failure of a creditor to properly provide such Adjustable Rate Disclosures may give rise to an extended right

to rescission; and will always provide a consumer with a viable claim for actual damages Ibid. See also <u>Mourning v. Family Publications Serv. Inc.</u>, 411 U.S. 356, 93 S. Ct. 1652, 36 L. Ed. 2d 318 (1973) <u>Wessel v. Shelby Fed. Savings & Loan, Clearinghouse No. 49,961</u> (S.D. Ind. 1992) See also 15 U.S.C. § 1638. **At no time prior to the date of closing of the subject transaction did Fremont Investment & Loan provide defendant MARIA ROSE FIORENZA with any preliminary disclosure containing such information on this loan.**

8.    As Fremont Investment & Loan failed to serve defendant herein with material disclosure concerning the subject transaction at any time prior to the date of consummation of the transaction at issue; **defendant MARIA ROSE FIORENZA has exercised her right to rescind/cancel the subject loan.** Defendant has taken action to this effect on two fronts: (i) Defendant has commenced an action in United States District Court, Southern Distinct, to enforce this right. This action is entitled "Maria Rose Fiorenza, Plaintiff, v. Fremont Investment & Loan, HSBC Bank USA, National Association as Trustee for Nomura Home Equity Loan Inc. Asset-Backed Certificates, Series 2006 –FM2 and Grace M. Pellegrino, D/B/A/ GMP Financial Services (venued in United States District Court, Southern District, pursuant to Docket No.: 08-8658). A duplicate copy of the subject Complaint filed in this action is annexed hereto and made a part hereof as **Exhibit "3"**. The filing of a Complaint has been held sufficient as a "written communication" of the consumer's election to cancel. See <u>Jones v. Saxon Mortgage, Inc.</u>, 161 F.2d 2(table), 1998 WL 614150 (4th Circuit, September 9, 1998); <u>Taylor v. Domestic Remodeling, Inc.</u>, 97 F.3d 96 (5th Circuit, 1996); <u>Garedakis v.</u>

Indymac Bank, 2004 WL 2254676 (N.D. Cal. October 4, 2004); Thomas v. GMAC

Residential Funding Corp., 309 B.R. 453 (D.Md 2004); Payton v. New Century

Mortgage Corp., 2003 WL 22349118 (N.D. Ill. October 14, 2003); Pulphus v. Sullivan,

2003 WL 1964333 (N.D. Ill. April 28, 2003); Bial v. Household Fin. Corp., 296 B.R.

828 (D. Kan. 2003); Mcintosh v. Irwin Union Bank & Trust Co., 215 F.R.D. 26 (D.

Mass. 2003); Eveland v. Star Bank, 976 F. Supp 721 (S.D. Ohio, 1997); Elliott v.

ITT Corp., 764 F. Supp. 102 (N.D. Ill, 1991); Talbert v. F.H.A. Contractors,

Clearinghouse No 44,818( S.D. Fla. 1988); Hunter v. Richmond Equity Corp.,

Clearinghouse No. 43,060 (N.D. Ala 1987); In re Rodrigues, 278 B.R. 683

(Bankr. D.R.I. 2002). See also Truth In Lending, National Consumer L aw Center/

Sixth Edition, by Elizabeth Renuart and Kathleen Keest (2007). In the subject federal

action brought by defendant MARIA ROSE FIORENZA, defendant asserts her right

to cancel/rescind the subject loan on the basis of those material violations of the Truth

In Lending Act enumerated herein. **(ii)** Defendant has also executed a separate

rescission notice which has been recently forwarded to Fremont Investment & Loan

(as the original lender to the subject loan, as well as HSBC Bank USA, National

Association as Trustee for Nomura Home Equity Loan Inc. Asset-Backed Certificates

Series, Series 2006-FM 2, as the "assignee to the subject loan (including counsel

representing said entity in the subject foreclosure action. Duplicate copies of

plaintiff's rescission notice as well as correspondence forwarded by your affirmant

(by certified mail/return receipt requested) are annexed hereto and made a part hereof

as **Exhibit "4"**. This rescission notice has also been forwarded to plaintiff's counsel

herein. Sending the notice to an attorney who is acting on behalf of the owner of a mortgage obligation with respect to the subject transaction in question is effective as forwarded such notice to the actual holder. See Official Staff Commentary to Regulation Z § 226.2(a)(22)-2. See also Truth In Lending, National Consumer Law Center/Sixth Edition, by Elizabeth Renuart and Kathleen Keest (2007).

9. As defendant MARIA ROSE FIORENZA has properly asserted her right to rescind the subject mortgage loan, plaintiff HSBC herein should not be permitted to proceed with a foreclosure sale of the subject premises. Such a sale would seriously prejudice defendant MARIA ROSE FIORENZA's right to enforce her rescission/cancellation of the underlying transaction. Furthermore, defendant MARIA ROSE FIORENZA has exercised her right to rescind in a timely fashion, as such right has been exercised within three years of the date of the subject transaction (pursuant to language imposed by 15 U.S.C. § 1635). As such, defendant is entirely within her rights to take those steps necessary to rescind and/or cancel the subject loan. **Accordingly, it is defendant's position that she has taken proper steps to cancel the subject loan. As such, the sale of defendant's residential premises cannot proceed forward.**

10. The Honorable Court should also be apprised that the subject mortgage transaction appears to have resulted from materially deceptive and fraudulent activity undertaken by both Fremont Investment & Loan and Grace M. Pellegrino, D/B/A/ GMP Financial Services. It is clear that defendant MARIA ROSE FIORENZA was never provided with any preliminary disclosure relative to the subject loan; and was

thereby deprived of the ability to compare this loan with other borrowing opportunities available to her at the time of her application on the subject loan. Defendant MARIA ROSE FIORENZA was interested in financing because she was seeking mortgage terms with more favorable payment obligations. The broker to the subject loan, Grace M. Pellegrino, advised defendant that obtaining such loan financing would be "no problem", due to the "equity" which defendant had in her property. Defendant, in reliance upon Ms. Pellegrino's advisement, decided to proceed forward with the subject transaction. **Unbeknownst to defendant, Ms. Pellegrino apparently inflated defendant's income for this purpose, as it appears that the loan was subsequently issued on the basis of defendant earning an income well in excess of what she was actually earning at that time.** Ms. Pellegrino apparently provided such inflated information to Fremont Investment & Loans to ensure that the loan would ultimately close (thereby ensuring Ms. Pellegrino of a sizeable broker commission, as she earned approximately $12,690.00 from the subject transaction for "services rendered"). Defendant MARIA ROSE FIORENZA was entirely unaware of such income information provided by Grace Pellegrino (which was subsequently unverified by Fremont Investment & Loan). Defendant, in reliance upon Ms. Pellegrino's representations, agreed to proceed with the subject loan transaction, which both Fremont Investment & Loan and Grace Pellegrino knew was of no net tangible benefit to the defendant. Defendant MARIA ROSE FIORENZA, who possesses the equivalent of a third grade education, relied upon the representations made by Ms. Pellegrino in agreeing to proceed on the subject transaction. As it turned out, this transaction imposed

to plaintiff HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE

FOR NOMURA HOME EQUITY LOAN, INC. ASSET-BACKED CERTIFICATES,

SERIES 2006-FM2 was recorded with the County Clerk, County of Bronx, until after

the date of commencement of the subject action. An ACRIS search on defendant's

residential premises establishes that the subject assignment was recorded with the Bronx

County Clerk on April 5, 2007; and after the date of commencement of this action

(March 19, 2007). Annexed hereto and made a part hereof as **Exhibit "7"** is a

duplicate copy of said ACRIS search conducted by your affirmant on defendant's

property. Plaintiff in its foreclosure Complaint also admitted that such assignment had

not been recorded as of the date of commencement of this action. As such, without a

validly recorded assignment of the subject mortgage, it does not appear that plaintiff

had standing to bring the subject foreclosure action at the time that it did.

    12.  Defendant MARIA ROSE FIORENZA interposed both an Answer and

Amended Answer to the subject Complaint. A duplicate copy of these pleadings are

annexed hereto and made a part hereof as **Exhibit "8"**. In neither of these pleadings

did defendant interpose affirmative defenses relating to said material violations of

Federal Truth In Lending disclosure requirements committed by the lender to the

subject loan, Fremont Investment & Loan; nor did she make reference to the deception

and/or fraud employed by Fremont Investment & Loan and/or Grace Pellegrino,

G/M/P Financial Services, in connection with their processing of the subject loan.

Defendant's Answer and Amended Answer actually raised defenses which centered on

fraud perpetrated upon the defendant by a contractor to the loan, which accounted for the

outstanding balance owed to said entity known as Stillwater Asset Fund, LLP (satisfied

from the proceeds of the subject loan); and also accounts for the mechanics liens

wrongfully entered upon title to defendant's property. As such, counsel for plaintiff

brought a motion for summary judgment, which was granted by the Honorable Court

on the basis that defendant had failed to raise triable issues of material fact within

her Amended Answer concerning the allegations raised by plaintiff within its

Complaint (although the Honorable Court did deny plaintiff's application to strike

defendant's Answer). A duplicate copy of the order granting plaintiff summary

judgment, rendered by the Honorable Court on October 22, 2007, is annexed hereto and

made a part hereof as **Exhibit "9"** (the Court had originally granted plaintiff's motion,

pursuant to Order, dated September 13, 2007; but thereafter vacated such order *sua*

*sponte*, and substituted it with the subject October 22, 2007 order. While it appears that

the Court's September 13, 2007 order was served by plaintiff's counsel with "Notice of

Entry", it does not appear, upon information and belief, that plaintiff's counsel served

said October 22, 2007 with "Notice of Entry").

Defendant MARIA ROSE FIORENZA now seeks to amend her Answer to include

affirmative defenses predicated on violation of the Act's material disclosure requirements

committed by Fremont Investment & Loan, which defendant properly asserts gives her the

right to rescind/cancel the subject loan. The facts and circumstances underlying such

proposed affirmative defenses also form the basis of those claims which defendant has

timely brought with her herein referenced federal action, pursuant to 15 U.S.C. § 1635.

Defendant has also brought timely claims in her federal action, pursuant to Section 349 of

the New York State General Business law, relating to the processing of the loan by Fremont

Investment & Loan, as well as said lender's agent, Grace Pellegrino, D/B/A GMP Financial

Services. The timeliness of such claims should also permit defendant to raise related facts

as defenses in her Answer. Defendant MARIA ROSE FIORENZA should accordingly be

permitted to amend her answer to include those defenses herein enumerated; thereby

resulting in vacatur of the Honorable Court's October 22, 2007 summary judgment

order, as well as the Honorable Court's December 6, 2007 "Judgment of Foreclosure

and Sale".

      CPLR 3025(b) states succinctly:

> "A party may amend his pleading, or supplement
> it by setting forth additional or subsequent
> transactions or occurrences, at any time by leave
> of court or by stipulation of all parties. Leave
> shall be freely given upon such terms as may be
> just including the granting of costs and
> continuances.

The three (3) year period set forth by the Federal Truth In Lending Act wherein a

borrower must exercise a claim to rescission on a non-purchase money loan (as set

forth by 15 U.S.C. § 1635), has not expired. As defendant MARIA ROSE FIORENZA

has taken steps to exercise this right timely, both in the form of a federal action, as

well as by a separate rescission notice, defendant respectfully requests that this Court

render an order, pursuant to CPLR 3025(b), granting her leave to amend her Answer to

include those Truth In Lending based defenses enumerated herein, as well as defenses

based upon New York State consumer law; specifically, the New York State Deceptive

Acts and Practices Statute, as codified by Section 349 of the New York State Business

law. It is axiomatic that leave to amend a pleading should be "liberally construed",

especially when the adverse party cannot claim prejudice. Thompson v. Alleva,

76 A.D.2d 1022, 429 N.Y.S.2d 481 (3rd Department/1980). Such an amendment can

include imposition of defenses previously not raised in an Answer. Ciunci v. Wella

Corp., 23 A.D.2d 754, 258 N.Y.S.2d 994 (1st Department/1965). Plaintiff herein

would not be prejudiced by permitting defendant's Answer to be amended to raise

affirmative defenses which are based on the very same facts and circumstances which

form the basis of those claims raised by the defendant in her federal action, as such

claims have been timely brought against not only the plaintiff herein; but also the

original lender to the loan and the individual rendering "broker" services. Annexed

hereto and made a part hereof as **Exhibit "10"** is a duplicate copy of the proposed

"Amended Verified Answer" which defendant MARIA ROSE FIORENZA seeks to

interpose.

    13. As defendant MARIA ROSE FIORENZA seeks permission to interpose

an Amended Answer, she also seeks vacatur of the Honorable Court's Summary

Judgment order rendered by the Honorable Court on October 22, 2007 (**Exhibit "9"**),

as well as the Honorable Court's "Judgment of Foreclosure and Sale", dated

December 6, 2007 ( a duplicate copy of which is annexed hereto and made a part hereof

as **Exhibit "11"**). CPLR 5015(a) allows a Court to vacate a judgment "upon such terms

as may be just". See also New York Practice, Thomson & West/Fourth Edition, by David

Siegel (2005). The Court has inherent discretionary power to vacate its judgments and orders for good cause shown, pursuant to CPLR 5015(a), even if such a basis for vacatur is not referenced by those grounds included within the language of the statute. McMahon v. City of New York, 105 A.D.2d 101, 483 N.Y.S.2d 228 (1st Dept 1984) See also 3d Rep.Leg.Doc. (1959) No. 17, p.204, referencing Ladd v. Stevenson, 112 N.Y. 325, 19 N.E. 842 (1889). See also New York Practice, Thomson & West/Fourth Edition, by David Siegel (2005). As defendant MARIA ROSE FIORENZA has meritorious defenses to those allegations raised within plaintiff's Complaint; and has exercised her right to rescind/cancel the subject transaction, the Honorable Court's order granting plaintiff summary judgment, as well as the Court's "Judgment of Foreclosure and Sale" should be vacated; and defendant should be permitted to raise affirmative defenses in her Answer which relate to the very same claims raised in her federal action.

The Honorable Court should also note that defendant MARIA ROSE FIORENZA was never provided with a fair chance to oppose the motion brought by plaintiff's counsel concerning their application for a foreclosure judgment. This is due to the fact that the papers in question were apparently served upon defendant MARIA ROSE FIORENZA, at an address where she did not reside at the time such application was brought. Defendant was served at 86 Crescent Place, Yonkers, New York. This was an address where defendant resided briefly while her principal residential premises at 1336 Gillespie Avenue was undergoing major renovational improvements (during which time defendant was unable to reside within her property). Defendant was

residing at this address at the time of commencement of this lawsuit, as renovations

on her residential premise had not been completed. Defendant has moved back within

her residence for an extended period thereafter. When plaintiff served their motion for

a foreclosure judgment, papers were apparently forwarded to the Crescent Place address,

when defendant MARIA ROSE FIORENZA was no longer residing at said address (and

with defendant not receiving mail at that address). Furthermore, of even greater

importance, defendant MARIA ROSE FIORENZA had retained a prior attorney to

represent her in this matter (James G. Striar, Esq., with offices located at 1500 Astor

Avenue, Suite 201, Bronx, New York 10469), who was known to plaintiff's counsel, as

he had even interposed opposition papers to plaintiff's prior motion for summary

judgment (Annexed hereto and made a part hereof as **Exhibit "12"** is a duplicate copy

of correspondence forwarded by Mr. Striar to plaintiff's counsel, in connection with

defendant MARIA ROSE FIORENZA's opposition to plaintiff's motion for summary

judgment. Despite knowledge of such counsel, plaintiff's attorneys failed to serve said

application for a Foreclosure Judgment on Mr. Striar's office at any time; and, upon

information and belief, has never served the Honorable Court's "Judgment of Foreclosure

and Sale" upon said counsel. As a result of plaintiff's failure to properly serve their

application for a "Judgment of Foreclosure and Sale" upon defendant MARIA ROSE

FIORENZA or defendant's counsel, the resultant judgment rendered by the Honorable

Court was granted "on default". As such, the Honorable Court's "Judgment of

Foreclosure and Sale" should not be allowed to stand.

    14. CPLR 5015 states succinctly:

"(a) on motion. The court which rendered a judgment or order may relieve a party from it upon such terms as may be just, on motion of any interested person with such notice as the court may direct, upon the ground of:

(1) excusable default, if such motion is made within one year after service of a copy of the judgment or order with written notice of its entry upon the moving party, or, if the moving party has entered the judgment or order, within one year after such entry: . . ."

In reviewing whether a party seeking to vacate a default judgment has satisfied the dictates imposed by CPLR 5015(a), the Courts will consider several factors: **(i)** valid or reasonable excuse for the default; **(ii)** absence of willfulness; **(iii)** the procedural history of the case; **(iv)** the length of the delay in moving to vacate the default; **(v)** the merit of the underlying cause of action or defense; **(vi)** whether any prejudice would result from vacating the subject default. Maze v. Di Bartolo, 97 App Div 2d 815, 469 NYS2d 688 (2nd Department/1983); Silberstein v. Production Fashions, Ltd., 137 App Div 2d 805, 525 NYSd2 267 (2nd Department/1988); Arred Enterprises Corp. v. Indemnity Ins. Co., 108 App Div 2d 624, 485 NYS2d 80 (1st Department/1985); Northeastern Harness Horsemen's Association v. Saratoga Harness Racing, 216 AD2d 746, 628 NYS2d 436 (3rd Department/1995); Great American Insurance Company v. Ramasso, 93 Misc 2d 186, 402 NYS2d 556 (1978); Genesee Management v. Barrette, 771 NYS2d 778 (App Div, 4th Department./2004); In re Vanessa F.(Anonymous), 779 NYS2d 917 (2004, App Div, 2nd Department/2004).

15. In connection with the subject matter, defendant MARIA ROSE FIORENZA,

pursuant to the dictates imposed by CPLR 5015(a), has proffered a clearly reasonable

explanation for her default which resulted in the subsequent Order entitled "Judgment

of Foreclosure and Sale", rendered by the Honorable Court on December 6, 2007.

Defendant really had no reason to believe that he was even in default, insofar as neither

she nor her counsel were properly served with the underlying application. There

was clearly no willfulness on the part of defendant MARIA ROSE FIOREZA in failing

to proffer opposition to such application by the plaintiff. Furthermore, as the Honorable

Court's resultant order was rendered barely two months ago, the resultant delay in

defendant's pending application to vacate such default has been minimal, and cannot

be considered to be prejudicial to plaintiff or plaintiff's counsel in any way. If anything,

it is defendant MARIA ROSE FIORENZA who would be severely prejudiced by not

being able to address the subject application brought for a "Judgment of Foreclosure and

Sale"; insofar as defendant is able to proffer Affirmative Defenses based upon clear

violation of Truth In Lending Law, as set forth by 15 U.S.C. § 1601 et Seq. and

Regulation Z, 12 C.F.R § 226, and Regulation Z, 12 C.F.R § 226; and violation of

the New York State Deceptive Act & Practices Statute, as set forth by Section 349 of the

New York State General Business Law (as well as common law fraud and basic principles

of equity). Defendant's default in this matter, as well as the resultant Judgment of

Foreclosure and Sale upon which said default is based, should be vacated, as defendant

MARIA ROSE FIORENZA should be deemed entitled to litigate this matter on the

Merits. The Honorable Court's October 22, 2007 order which granted plaintiff summary

judgment also be vacated, on the basis that defendant has clearly set forth herein the

existence of defenses which are based upon facts and circumstances which, at the very

least, create triable issues of material act concerning the allegations raised within

plaintiff's complaint.

16. In the alternative, should the Honorable Court not see fit to render an order

permitting defendant to interpose an Amended Answer and/or vacating the subject

"Judgment of Foreclosure and Sale", your affirmant seeks a stay of the foreclosure

sale of her residential premises scheduled for March 3, 2008, by reason of pending

federal litigation concerning the issue of defendant's right to rescind the subject

transaction. CPLR 2201 allows any Court to stay its own proceedings "in a proper case,

upon such terms as may be just". Furthermore, the very language of CPLR 3211(a)(4)

authorizes a Court to suspend one action because of the pendency of another action in

another court between the same parties on the same claim (the language of this statute

even authorizes a dismissal in such an instance). See also New York Practice, Thomson

& West/Fourth Edition, by David Siegel (2005).

17. That accordingly, in light of defendant MARIA ROSE FIORENZA having

exercised her right to cancel/rescind the subject loan which forms the basis of this

foreclosure action; defendant requests that the Honorable Court vacate its "Judgment of

Foreclosure and Sale", dated December 6, 2007, and permit defendant MARIA ROSE

FIORENZA to interpose an Amended Answer in a manner set forth by the Honorable

Court and/or stay the subject foreclosure sale of defendants premises scheduled for

March 3, 2008, by reason of pending federal litigation concerning the very same

transaction which is the subject of this foreclosure action.

18.   That no prior request for the relief requested herein has been made in the above-entitled action.

**WHEREFORE**, it is respectfully requested that defendant MARIA ROSE FIORENZA'a's application for the relief requested be granted in its entirety, thereby staying the foreclosure sale scheduled for March 3, 2008; and vacating the "Judgment of Foreclosure and Sale" dated December 6, 2007, as well as vacating the Honorable Court's order which rendered plaintiff summary judgment, dated October 22, 2007; and permitting the defendant to interpose an Amended Answer; and for such other and further relief as this Court may deem just and proper.

Dated:    Brooklyn, New York
          February 15, 2008

DAVID M. HARRISON, ESQ.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

-----------------------------------------------------------------x

HSBC BANK USA, NATIONAL ASSOCIATION       Index No.: 13039/07
AS TRUSTEE FOR NOMURA HOME EQUITY
LOAN, INC. ASSET-BACKED CERTIFICATES,       **AFFIDAVIT**
SERIES 2006-FM2,

Plaintiff,

-against-

MARIA ROSE FIORENZA, NICOLE
ORDINE D/B/A ORDINE CONTRACTING
COMPANY; JAN VASSALOTTI;
STREAMLINE WINDOWS, INC.;
NEW ELJAM PRODUCTS, INC.;
CITY OF NEW YORK ENVIRONMENTAL
CONTROL BOARD;

Defendant(s).

-----------------------------------------------------------------x

STATE OF NEW YORK      )
                               ) ss.:
COUNTY OF KINGS       )

    **MARIA ROSE FIORENZA**, being duly sworn, deposes and says:

    1. That I am the defendant in the within action.

    2. That I execute this Affidavit, in connection with Defendant's motion for an order vacating the Honorable Court's December 6, 2007 order granting plaintiff's motion for a Judgment of Foreclosure and Sale, and permitting defendant Maria Rose Fiorenza to serve an Amended Answer for the purpose of interposing affirmative defenses predicated upon violation of disclosure requirements mandated by the Truth In Lending

Act, as set forth by 15 U.S.C. § 1601 et Seq., as well as Federal Reserve Board Regulation Z,

12 C.F.R. § 226, which implements the act; including 15 U.S.C. § 1640; Regulation Z §

226.17 and Regulation Z § 226.19(b); while also vacating the Honorable Court's

October 22, 2007 order granting plaintiff summary judgment, by reason of there being

triable issues of material fact concerning the allegations raised by plaintiff within its

Complaint; or in the alternative, staying foreclosure of the subject residential premises

located at 1336 Gillespie Avenue, Bronx, New York, pending resolution of litigation

concerning the subject premises, entitled MARIA ROSE FIORENZA, Plaintiff, v.

FREMONT INVESTMENT & LOAN, HSBC BANK USA, NATIONAL ASSOCIATION,

AS TRUSTEE FOR NOMURA HOME EQUITY LOAN, INC. ASSET-BACKED

CERTIFICATES, SERIES 2006-FM2 and GRACE M. PELLEGRINO, D/B/A GMP

FINANCIAL SERVICES, venued in United States District Court, Southern District of

New York, pursuant to Civil Action Number 0858/2000

    3.   That I am the record owner of the subject residential premises commonly known

and designated as 1336 Gillespie Avenue, Bronx, New York 10461.

    4.   The subject foreclosure action arises from a refinance money mortgage loan

which was effectuated on or about May 11, 2006. This loan was secured by my subject

residential premises. The "lender" to this loan was Fremont Investment & Loan. The

"broker" to this loan was Grace Pellegrino, d/b/a GMP Financial Services. This loan

was allegedly assigned to HSBC BANK USA, NATIONAL ASSOCIATION AS

TRUSTEE FOR NOMURA HOME EQUITY LOAN, INC. ASSET-BACKED

CERTIFICATES, SERIES 2006-FM2, although there does not appear to be any

documents evidencing the recording of this assignment as of the date that the subject foreclosure action was commenced.

5.   The subject transaction consisted of an "adjustable rate"/"variable rate" loan, with a principal loan balance in the amount of $634,500.00, "plus interest and other amounts that may be payable". During the first two years of this loan, the applicable yearly interest rate was 9.000%. This interest rate was subject to change on June 1, 2008, pursuant to the terms of a document entitled "Adjustable Rate Note" provided to me on the date of "closing" of the subject transaction (May 11, 2006). The applicable yearly interest rate was subject to change on June 1, 2008, up to 11.000% (with such interest rate not to be higher than 11.000% or lower than 9.000%). Thereafter, after every year, the interest rate would be subject to change, with said applicable rate being between 9.000% and 15.000%.

6.   The applicable loan transaction was rendered pursuant to the following terms: "ANNUAL PERCENTAGE RATE" (described as "The cost of your credit at a yearly rate"): 11.618%; "FINANCE CHARGE" (described as "The dollar amount the credit will cost you"): $1,680,024.24); "Amount Financed" (described as "The amount of credit provided to you on your behalf"): $616,977.30; and the "Total of Payments" (described as "The amount you will have paid after you have made all payments as scheduled"): $2,297,001.54. This information was contained in the "Truth In Lending Disclosure Statement" which I received on the date of closing of the subject loan transaction (May 11, 2006).

7.   That at no time prior to the date of "closing" of the subject loan transaction

did I ever receive required Adjustable Rate Mortgage disclosure information, as mandated by Federal Truth In Lending Law, including Regulation Z § 226.19(b).

8.    That at no time prior to the date of the subject loan transaction did I ever receive required Federal Truth In Lending disclosure information, as mandated by Federal Truth In Lending Law, including 15 U.S.C. # 1640 and Regulation Z § 226.17(b).

9.    That by reason of the failure of Fremont Investment & Loan to provide me with either preliminary/early Adjustable Rate Mortgage disclosure or Federal Truth In Lending information, I am exercising my right to rescind and/or cancel the subject loan, pursuant to Federal Truth In Lending law, including 15 U.S.C. § 1635 (which provision extends a consumer's right to exercise such right of rescission/cancellation for three years following the date of consummation in the event of a lender's failure to provide disclosure). I am exercising this right through commencement of an action venued in United States District Court, Southern District of New York, entitled MARIA ROSE FIORENZA, Plaintiff, v. FREMONT INVESTMENT & LOAN, HSBC BANK USA, NATIONAL ASSOCIATION, AS TRUSTEE FOR NOMURA HOME EQUITY LOAN, INC. ASSET-BACKED CERTIFICATES, SERIES 2006-FM2 and GRACE M. PELLEGRINO, D/B/A GMP FINANCIAL SERVICES, pursuant to Civil Action No.: 0858/2008. I am also exercising this right by execution of a rescission notice.

10.    The Honorable Court should also know that the broker to the subject loan, Grace M. Pellegrino, d/b/a GMP Financial Services, apparently provided false income information to Fremont Investment & Loan, in connection with the subject loan transaction. The subject loan was apparently based upon a yearly income which approximates

$70,000.00. I have never earned a yearly income which even approximates this amount.

11. It also does not appear that the alleged "assignment" of the subject mortgage loan was properly recorded with the County Clerk, County of Bronx; or any other like entity as of the date of commencement of this action. This belief is based upon a search with ACRIS which reflects the assignment of the subject mortgage from Fremont Investment & Loan to the plaintiff, HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR NOMURA HOME EQUITY LOAN, INC. ASSET-BACKED CERTIFICATES, SERIES 2006-FM2 on April 5, 2007. In the absence of a valid recording of the subject loan, it is questionable as to whether the plaintiff even had standing to proceed with the subject foreclosure action commenced on March 19, 2007.

12. The above-referenced SDNY action, filed under the Truth In Lending Act, 15 U.S.C. # 1601 et Seq. to enforce plaintiff's right to rescind the subject consumer credit transaction, and to void the security interest in my home held by Fremont Investment & Loan and/or plaintiff, HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR NOMURA HOME EQUITY LOAN, INC. ASSET-BACKED CERTIFICATES, SERIES 2006-FM2; and to recover actual monetary damages; statutory damages; reasonable attorney fees and costs against said parties, by reason of (i) violation by the original "lender" to the subject consumer credit transaction, Fremont Investment & Loan, as set forth by 15 U.S.C. § 1601 et Seq., as well as Federal Reserve Board Regulation Z, 12 C.F.R. § 226, which implements the act; (ii) violation by the original "lender" to the subject consumer credit transaction, Fremont Investment & Loan, as set forth by 15 U.S.C. § 1639, as well as Federal Reserve Board Regulation Z,

12 C.F.R. § 226.31, 12 C.F.R. § 226.32 and 12 C.F.R. § 226.34; **(iii)** violation by the original "lender" to the subject consumer credit transaction, Fremont Investment & Loan, as well as defendant Grace M. Pellegrino, d/b/a GMP Financial Services, as codified by Section 349 of the New York State General Business Law; **(iv)** violation by defendant Grace M. Pellegrino, d/b/a GMP Financial Services, of Section 589 of the New York State Banking Law. This action also seeks monetary damages, including punitive damages, for multiple acts of fraud on the part of defendant Grace M. Pellegrino, d/b/a GMP Financial Services; and further seeks rescission of the subject consumer credit transaction, based upon general principles of equity. The subject action also references plaintiff having commenced a foreclosure lawsuit against me at a time when the alleged assignment of the loan had not even been recorded.

13. That I had previously interposed an Answer and Amended Answer to plaintiff's Complaint filed in connection with this foreclosure action. My Answer raised defenses based upon fraud that was perpetrated upon me by a contractor who was hired to perform renovations on my residential premises. As a result, my title is subject to mechanics liens improperly entered against my title. I did not raise any defenses relating to violation of Federal Truth In Lending law committed by the original lender to the loan, Fremont Investment & Loan, in either my Answer or Amended Answer; nor did I raise any defenses concerning violation of the New York State Deceptive Act and Practices Statute (Section 349 of the New York State Banking law) or fraud. I thereafter retained an attorney to represent me in this matter by the name of James G. Striar, Esq. with offices at 1500 Astor Avenue, Suite 201, Bronx, New

York 10469). A motion was brought by plaintiff's counsel for summary judgment, from which opposition papers were prepared by Mr. Striar. This motion was subsequently granted by the Honorable Court by Order dated October 22, 2007 (which it is my understanding was never served by "Order With Notice of Entry"). A subsequent application was brought by plaintiff's counsel for a "Judgment of Foreclosure and Sale". I was advised by Mr. Striar that this application was never forwarded to Mr. Striar's office. It is also my understanding that plaintiff's counsel served this application upon me by mailing related papers to 86 Crescent Place, Yonkers, New York 10704. This was an address where I was residing at the time I interpose both my Answer and Amended Answer, as my residential property (1336 Gillespie Avenue, Bronx, New York) was undergoing renovational improvements which prevented me from living within said premises. I did move back into my residential premises thereafter, and have been residing there ever since. As of the date of plaintiff's application for a "Judgment of Foreclosure and Sale", I was residing at 1336 Gillespie Avenue, Bronx, New York. I was not receiving mail at any other address; and I was not receiving mail at 86 Crescent Place, Yonkers, New York. I learned about the subject "Judgment of Foreclosure And Sale" after it had been granted by the Honorable Court. If I had known about plaintiff's application for such relief, I would have made attempts, through my attorney, to oppose it. The Honorable Court rendered a "Judgment of Foreclosure and Sale", on or about December 6, 2007 (on default). A foreclosure "sale" is tentatively scheduled for March 3, 2008 (with notice of said sale having been published in the New York Law journal).

14. That I bring an application to vacate the Honorable Court's December 6, 2007

order; and permitting me to interpose an Amended Answer, based upon meritorious defenses to those causes of action raised within the Foreclosure Complaint. It is my contention that the subject mortgage loan is entirely rescindable, by reason of Fremont Investment & Loan having completely failed to provide me with required pre-application disclosure, including Adjustable Rate Mortgage disclosure and Federal Truth In Lending Law information. It is also clear that the loan is a product of fraud, as it is based upon false income information imputed by a broker, Grace M. Pellegrino to the lender, Fremont Investment & Loan. I have subsequently learned that this same broker had her license suspended for a period of time (following the date of "closing" of the subject loan transaction) by the New York State Banking Department. It is also questionable whether plaintiff has a validly recorded assignment of the subject mortgage loan which would enable it to proceed on a foreclosure action. My attorney has reviewed these defenses with me, and advised me that such defenses appear meritorious. As such, I seek to amend my answer to raise these defenses.

15. In the alternative, should the Honorable Court deny my application to vacate the December 6, 2007 order; I seek imposition of a stay of any foreclosure sale, by reason of my federal action venued in Southern District Court. A foreclosure sale would result in irreparable damage to my contention that I have validly rescinded and/or cancelled the subject mortgage loan, pursuant to rights granted me under Federal Truth In Lending law. The plaintiff in this foreclosure action (as well as the original lender and broker to the loan) have been made parties in this action. A foreclosure sale of my premises would severely prejudice the prosecution of those clams brought in my federal action.

16.   That I am entirely unaware as to any prior application for the herein requested

relief.

Sworn to before me this 1st
day of February , 2008

_____
NOTARY PUBLIC

PAMELA S. ROTH
Notary Public, State Of New York
No. 02RO6083226
Qualified in Kings County
Commission Expires 11-12-20 10

_____
MARIA ROSE FIORENZA